[No. S041557. Apr. 4, 1996.]

CATHERINE HOLTHOUSE MANGINI et al., Plaintiffs and Appellants,
v.
AEROJET-GENERAL CORPORATION, Defendant and Appellant.

**COUNSEL**

McCutchen, Doyle, Brown & Enersen, John R. Reese, Christopher Berka, Claire T. Cormier and Steven G. Rosen for Plaintiffs and Appellants.

Jose N. Uranga, Lasky, Haas, Cohler & Munter, Lasky, Haas & Cohler, Moses Lasky, Richard Haas, Charles B. Cohler, Epstein, Becker & Green and Janet Morgan for Defendant and Appellant.

McClintock, Weston, Benshoof, Rochefort, Rubalcava & MacCuish, Steven W. Weston and Edward J. Casey as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**ARABIAN, J.**[*]—We granted review to examine the law of nuisance as it bears on a suit seeking damages for the contamination of land through the dumping of toxic wastes. Specifically, we consider the requirement that, in attempting to avoid the bar of the statute of limitations by demonstrating that the nuisance is "continuing" (or "temporary") rather than "permanent," the plaintiff must present substantial evidence that the contaminated condition is one that is both subject to remediation (or cleanup) and that the cost of cleanup is "reasonable."

As will appear, we conclude that the Court of Appeal was correct in holding in this case that, because plaintiffs had failed to present *any* substantial evidence that the contamination of their land as a result of defendant Aerojet-General Corporation's (Aerojet's) practice of dumping and burning a toxic solvent was capable of being abated at a reasonable cost, the nuisance must be deemed permanent. Because the three-year statute of limitations applicable to such a permanent nuisance had long since expired on the date this suit was filed, the Court of Appeal held that plaintiffs' nuisance and trespass claims were time barred. We agree with the Court of Appeal's analysis—adopting both its result and much of its reasoning—and conclude that the trial court should have granted Aerojet's motion for judgment notwithstanding the jury's award of some $13.2 million in damages to plaintiffs. We emphasize, however, that our ruling in this case is confined to the statute of limitations issue before us. We express no opinion on the question whether a plaintiff who has filed a *timely* nuisance action is required to prove that abatement can be accomplished at a "reasonable cost" in order to be entitled to an injunction requiring the wrongdoing party to remedy the damage to the property.

I

A

Aerojet is a large industrial manufacturer of solid fuels, among other products, used by the nation's space and military technology agencies in the

[*]Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

propulsion of rockets. The company operates a large plant in the Sacramento Valley where it produces these fuels. In 1960, Aerojet leased from the Cavitt family some 2,400 acres of unimproved land in the valley for the purpose of disposing of waste materials generated in its nearby solid fuel production plant. By the terms of the lease agreement, Aerojet agreed to pay the Cavitts $50,000 a year for the 10-year term of the lease; the company also obtained an exclusive right to purchase the acreage at any time during the life of the lease for $2,365,500. The lease included a standard covenant by Aerojet to surrender the property to the Cavitts on the termination of the lease "in as good state and condition as when received by Lessee, reasonable use and wear thereof consistent with the business engaged in by Lessee . . . excepted."

Another provision of the lease recited that the Cavitts "are aware that certain activities of Lessee on the leased premises may be of a hazardous nature and that from time to time activities conducted on the premises may have an element of nuisance about them or resulting from them. In this connection, Lessors hereby covenant that they will acquiesce in any nuisance or hazard caused by Lessee on the premises. Lessee shall, however, indemnify Lessors against any damage to range grasses or loss or injury to their livestock caused by the activities of Lessee in conducting its business on the premises."

It appears that over the following 10 years, Aerojet routinely dumped and burned on the Cavitt acreage toxic solid fuel components, amounting to several million pounds, including, to adopt Aerojet's characterization, "quantities of waste sludge consisting of highly explosive rocket propellants containing a cleaning solvent" known as trichloroethylene (or TCE) that is toxic to human and animal life.[1] In 1972, two years after the lease had terminated, Mr. Cavitt complained to Aerojet officials that the soil on parts of his ranchland had been impaired and that range grasses would not regenerate. In 1973, he signed a broadly framed document entitled "Release of all demands" which by its terms purported to "release, exonerate and forever discharge" Aerojet from any and all claims, known and unknown, "arising out of or otherwise connected directly or indirectly with any and all real estate transactions between me and Aerojet-General Corporation . . . ." The release specifically referred to the 1960 lease agreement, went on to recite the payment of $7,500 to Cavitt as consideration for his release of all claims, purported to bind Cavitt's assigns, and acknowledged that, prior to executing the release, Cavitt had had the benefit of advice from his attorney who had "read and explained" its terms to him. It appears that neither party to the release recorded it.

---

[1] In addition, higher than normal quantities of heavy metals—arsenic, chromium, copper, lead and zinc—were found on the property.

Plaintiffs acquired the Cavitt ranch in 1975 in a three-party transaction, trading land valued at $600,000 which they owned in the Santa Clara Valley to IBM in exchange for a deed to the Cavitt ranch from IBM, which had simultaneously acquired title to it from the Cavitt estate following Mr. Cavitt's death. The Manginis testified at trial that they anticipated building a residence on part of the property and holding the remainder for resale when market conditions in this developing eastern corner of the Sacramento Valley were optimal, using it in the meantime to graze cattle. Although they had no notice of any chemical contamination of the land when they purchased it, in 1984 a representative of Aerojet asked plaintiffs for permission to conduct some field tests on the land. They agreed to the tests and were later told by company officials that the results were useless owing to a "laboratory error." Plaintiffs had already been interviewed by a representative of the United States Department of Justice in late 1979; he told them that the agency was investigating acreage surrounding the Aerojet plant for possible chemical contamination.

As early as 1975, the State of California had filed a lawsuit against Aerojet, alleging that the property on which its plant was sited had been contaminated by hazardous wastes; the state's complaint was later expanded to include allegations that Aerojet had contaminated plaintiffs' parcel and other neighboring parcels. In addition, the federal government began an investigation of conditions at the Aerojet site, leading to a joint federal-state consent decree filed in federal court proceedings in 1988. One consequence of these prior proceedings was that in January of 1988 plaintiffs retained an attorney who filed this action for damages against Aerojet, pleading in support of the complaint theories of public and private nuisance, trespass, negligence, negligence per se, strict liability and equitable indemnity. Aerojet filed a demurrer to the complaint, which the trial court sustained, and plaintiffs appealed.

## B

In the first of two opinions previously filed in this matter (*Mangini* v. *Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125 [281 Cal.Rptr. 827] (*Mangini I*), the Court of Appeal rejected Aerojet's claim that theories of private nuisance were not maintainable against a lessee of a predecessor in interest of the plaintiff landowner because nuisance claims are limited to acts originating *outside* the plaintiff's property that cause damage *indirectly*. The court's opinion in *Mangini I* also validated plaintiffs' nuisance/trespass theories of liability in all other respects, particularly the contention that the contamination of their property caused by Aerojet's dumping and burning of hazardous chemicals over the life of its lease *might* qualify as a "continuing"

nuisance and trespass because, although the actual dumping at the site had ceased, toxic chemicals continued to migrate within the soil itself, causing further damage to the land. In reaching the merits of plaintiffs' nuisance claim after the trial court had sustained Aerojet's demurrer to the complaint without leave to amend, the Court of Appeal in the initial appeal began by acknowledging the traditional distinction between so-called "permanent" and "continuing" nuisances: "[W]here a private citizen sues for damage from a permanent nuisance, the statute of limitations begins to run upon creation of the nuisance. Where a continuing nuisance is alleged, every continuation of the nuisance gives rise to a separate claim for damages caused by the nuisance." (230 Cal.App.3d at p. 1143.)

The court then addressed the critical question of the nature of the nuisance alleged by plaintiffs. Relying on prior decisions of this court, it stated that "the crucial distinction between a permanent and continuing nuisance is whether the nuisance may be discontinued or abated," and concluded that, although features of the original complaint suggested plaintiffs had alleged a permanent nuisance, their "proposed pleading . . . meets the crucial test of a continuing nuisance: that the offensive condition is abatable." (*Mangini I, supra*, 230 Cal.App.3d at pp. 1146, 1147, fn. omitted.) The court also observed that plaintiffs were free to amend their complaint to allege an alternative test of continuing nuisance recently formulated in another case: "The salient feature of a continuing trespass or nuisance is that its impact may vary over time." (*Field-Escandon* v. *DeMann* (1988) 204 Cal.App.3d 228, 234 [251 Cal.Rptr. 49].) The court remanded the case to the superior court so that plaintiffs' claims could be tested at trial. We denied Aerojet's ensuing petition for review of that disposition.[2]

Following remand, plaintiffs were permitted to amend their complaint to conform to the theory of continuing nuisance developed in the Court of

---

[2]In the interim between the Court of Appeal's first opinion and the subsequent appeal from a judgment on the jury's verdict, several other intermediate appellate courts have published opinions in similar cases, adopting the reasoning of *Mangini I* validating private nuisance actions as an effective vehicle for the pursuit of damage claims seeking redress for the chemical contamination of real property on the theory that such injuries to land are "continuing" or "temporary" as opposed to "permanent," and thus not barred by the three-year statute of limitations prescribed by Code of Civil Procedure section 338, subdivision (b). (See, e.g., *Capogeannis* v. *Superior Court* (1993) 12 Cal.App.4th 668 [15 Cal.Rptr.2d 796] [leakage of petroleum from underground tanks installed by plaintiff's predecessor in interest]; *Newhall Land & Farming Co.* v. *Superior Court* (1993) 19 Cal.App.4th 334 [23 Cal.Rptr.2d 377] [soil contamination as result of operation of natural gas processing plant by former owners]; *Wilshire Westwood Associates* v. *Atlantic Richfield Co.* (1993) 20 Cal.App.4th 732 [24 Cal.Rptr.2d 562] [leaking underground petroleum tanks]; *KFC Western, Inc.* v. *Meghrig* (1994) 23 Cal.App.4th 1167 [28 Cal.Rptr.2d 676] [release of petroleum products from underground tanks]; and *Arcade Water Dist.* v. *U.S.* (9th Cir. 1991) 940 F.2d 1265 [fouling of water well by soil migration of chemicals used in nearby military laundry]; see also *Spar* v. *Pacific Bell* (1991) 235 Cal.App.3d 1483 [1 Cal.Rptr.2d 480].) In none of these cases did the court address the issue decided by the Court of Appeal here—i.e., whether the plaintiff's

Appeal's *Mangini I* opinion, and the case proceeded to trial. After the jury returned a special verdict for plaintiffs in the amount of $13,232,000 Aerojet moved in the alternative for judgment notwithstanding the verdict or for a new trial on the alternative grounds that the release given by Mr. Cavitt amounted to a consent by the landowner to Aerojet's activities on the ranch and that the evidence at trial failed to establish that any nuisance or trespass on plaintiffs' property could be abated at a reasonable cost.

The trial court denied the first motion but granted Aerojet's motion for a new trial. With respect to Aerojet's motion for judgment notwithstanding the verdict, the trial judge, assessing the evidence before the jury bearing on the release, observed that "evidence indicates that the releaser, Mr. Cavitt, was a rancher, that he was aware of the type of activity Aerojet had conducted during its lease, and that he was represented by counsel. On the other hand, there was no evidence that Mr. Cavitt understood the nature of the chemicals that might remain on his land or that these might amount to hazardous waste. If any party possessed this knowledge, it would have been Aerojet, and there was no evidence of disclosure [to Cavitt]." Concluding that "a disparity of knowledge existed between the parties to the release of all claims given Aerojet by Mr. Cavitt" and that the disparity "was the sort that would make assessment of long-term harm difficult for the releaser," the trial court ruled that "[i]mplying consent in these circumstances would, in effect, grant an easement for maintenance of a hazardous waste site to the releasee for the sum of $7500. This would be a windfall. In these circumstances, neither the lease nor the release . . . constitutes consent so as to bar the plaintiffs' claim."

With respect to Aerojet's motion for a new trial, the trial court reached two conclusions. First, the potential cost of abating the contamination to plaintiffs' land "cannot be estimated with any accuracy" in light of the evidence, the trial court ruled, thus making the jury's finding that the nuisance was abatable "contrary to the clear weight of the evidence." Second, the trial court concluded that plaintiffs' proof of damages to their property "intertwines measures that would be appropriate for continuing nuisance or trespass with measures that apply to permanent nuisance. The damage award is excessive and fails to reflect the temporary nature of the continuing nuisance or trespass."

The parties then took cross-appeals. In its second opinion (*Mangini II*), the Court of Appeal overturned the jury's verdict in favor of plaintiffs, ruling

---

complete failure to offer substantial evidence of the cost and reasonableness of remediation leads ineluctably to the conclusion that the nuisance at issue is "permanent" for statute of limitations purposes—which we adopt today.

that the trial court should have granted Aerojet's motion for judgment notwithstanding the verdict because plaintiffs had failed to prove that the contamination was a continuing nuisance; it remanded the case, directing the trial court to grant Aerojet's posttrial motion for judgment in its favor.

In concluding in its second, posttrial opinion that the jury's damages verdict could not stand, the Court of Appeal held that plaintiffs had failed to present substantial evidence that Aerojet's chemical contamination of their land was capable of being cleaned up (or, in current parlance, "remediated") at a reasonable cost. To the Court of Appeal, the factual hinge for that conclusion consisted of testimony and admissions made in the course of *plaintiffs' case* itself. Thus, as pointed out in the opinion in *Mangini II,* one of plaintiffs' expert witnesses, Lambie, a hydrogeologist, after testifying concerning various technical methods for removing TCE from soil stated that "there's not enough known about the site yet to assess what remedial measures need to be done or can be done out there effectively. . . . We just don't know yet."

In Lambie's opinion, remediating the site could cost far more than $20 million, based on the assumption that only 12.5 acres of the 2,400 acres were excavated to a depth of 3 feet. That figure might jump, the witness testified, to as high as $75 million if as much as 20 percent of the acreage required treatment to a depth of six feet. Remediation would be very costly, Lambie concluded—"it could be an extremely large number." Plaintiffs' attorney conceded these uncertainties in the cost of cleanup in his closing remarks to the jury: "[N]obody really knows how much is there, where it is, what the chemicals are, or how much it's going to cost to abate the chemicals," he stated. "So I guess the bottom line, if you ask yourself the question, how bad really is this site, the answer's got to be you just don't know."

In the view taken by the Court of Appeal, these admissions by plaintiffs' expert and their counsel were fatal. As that court formulated the burden facing plaintiffs following remand, their "theory of the case at trial was that they were pursuing a cause of action for a continuing nuisance based on Aerojet's continuing failure to remove contaminants it had left on the property at the end of its lease. This theory of trial was consistent with and indeed necessitated by our decision in *Mangini I* that plaintiffs' action would be barred by the statute of limitations unless the nuisance was continuing rather than permanent."

Because, as the Court of Appeal put it, plaintiffs' proof established that "no one knows how bad the contamination is or how to remedy it," it followed that plaintiffs had failed to present substantial evidence that the

contamination was capable of being abated *at a reasonable cost.* And because the answer to the question whether a particular nuisance is continuing or permanent is whether it is "abatable"—reasonable cost being a component of "abatability"—plaintiffs had failed to make their case. It followed that their claims for damages were barred by the three-year statute of limitations prescribed by Code of Civil Procedure section 338, subdivision (b), because, the evidence showed, plaintiffs had notice of the contamination of their land at least as early as 1984, more than three years before their complaint was filed.[3]

We granted plaintiffs' petition for review and now affirm the judgment in favor of Aerojet, adopting in part the text of the Court of Appeal's opinion in *Mangini II,* authored by Justice Richard M. Sims III and concurred in by Presiding Justice Robert K. Puglia and Justice Coleman A. Blease. That portion of the Court of Appeal opinion which we adopt, with appropriate deletions and additions, is set forth in part II and the Conclusion which follow.*

II. *No Substantial Evidence of Abatability*

 Aerojet contends the statute of limitations bars this action unless plaintiffs establish[] a continuing[, i.e., abatable] nuisance. [We agree with the Court of Appeal that the judgment for plaintiffs must be reversed because there is no substantial evidence of continuing nuisance.][4]

Plaintiffs' theory of the case at trial was that they were pursuing a cause of action for a continuing nuisance based on Aerojet's continuing failure to remove contaminants it left on the property at the end of its lease. This theory of trial was consistent with and indeed necessitated by our decision in *Mangini I* that plaintiffs' action would be barred by the statute of limitations unless the nuisance was continuing rather than permanent.

The jury was instructed that there were two categories of nuisance—permanent and continuing, that plaintiffs were claiming a continuing nuisance, and that plaintiffs had the burden of proving by a preponderance of

---

[3]In light of its conclusion that plaintiffs' case fell short because of their failure to prove that the contaminated condition of their property could be reasonably abated, the Court of Appeal declared that it "need not address Aerojet's alternate contentions," including the claim that relief was barred by Cavitt's consent in the lease agreement itself and the subsequent release. Nor did the Court of Appeal consider Aerojet's argument that the doctrine of caveat emptor barred relief.

*Brackets together in this manner [] without enclosed material are used to denote deletions from the opinion of the Court of Appeal; brackets enclosing material are used to denote additions. Footnotes in the Court of Appeal opinion that have been retained are sequentially renumbered.

[4]We note Aerojet also contends that was no nuisance or trespass at all. We will assume for the sake of argument that the contamination was shown to constitute a nuisance and trespass.

the evidence all the facts necessary to establish a continuing (abatable) nuisance. The jury was also instructed that "abatable" meant that the contamination could be removed without unreasonable hardship and expense.

Thus, at trial, the question of whether any nuisance was a continuing nuisance was presented to the jury as an element of plaintiffs' cause of action for continuing nuisance. The question was not presented to the jury in the context of a "defense" or excuse by plaintiffs to avoid Aerojet's statute of limitations defense.

On appeal, no party complains of the manner in which the matter was submitted to the jury—as an element of plaintiffs' cause of action rather than as an exception to a statute of limitations defense. Thus, we need not consider whether there were any technical defects in the manner of presentation.

We turn now to the question whether there is substantial evidence of a continuing nuisance.

■ "Whether contamination by toxic waste is a permanent or continuing injury . . . turn[s] on the nature and extent of the contamination." (*Mangini I, supra*, 230 Cal.App.3d at p. 1148.) "[T]he crucial test of the permanency of a trespass or nuisance is whether the trespass or nuisance can be discontinued or abated." (*Ibid.*)

■ In this case the evidence clearly showed that no one knows how bad the contamination is or how to remedy it—indicating an absence of substantial evidence of abatability. Plaintiffs, however, challenge the jury instruction, raising questions as to who had the burden of proof on this issue and what is the standard for abatability. We will therefore begin with the evidence, then turn to plaintiffs' contentions.

### A. *What the Evidence Showed*

As reflected in our recitation of the facts, the evidence adduced at trial showed that contaminants were found but the extent of contamination and viability of remediation are unknown. In the words of plaintiffs' expert: "[T]he heart of the situation is there's not enough known about the site yet to assess what remedial measures need to be done or can be done out there effectively."

Additionally, both at trial and on appeal plaintiffs conceded the lack of evidence of the extent of contamination and what it would take to decontaminate the property. ■ The concessions appear in plaintiffs' closing argument to the jury and in their appellate brief, both of which may be taken

as admissions against the party. (*Mangini I, supra,* 230 Cal.App.3d at p. 1152; *DeRose* v. *Carswell* (1987) 196 Cal.App.3d 1011, 1019, fn. 3 [242 Cal.Rptr. 368].) []

 On appeal, plaintiffs again concede there was no evidence of the extent of the contamination. Thus, they state in their appellate brief that "the total volume of soil requiring remediation has not yet been determined . . . ."

[B.] *Meaning of "Abatable"*

The next question is: what does "abatable" mean?

The jury was instructed that plaintiffs must prove "that whatever they claim constitutes the nuisance is actually and practically abatable by reasonable measures and without unreasonable expense. Theoretically, anything can be removed. But an abatable [] nuisance is one which as a practical matter considering hardship and cost can be removed."

On appeal, plaintiffs challenge the jury instructions, contending abatement does not necessarily mean complete elimination of the condition causing the nuisance but can mean a lessening of the condition. Plaintiffs suggest they would be content with a cleanup level that is less than total but satisfactory to the regulatory agencies. (*Capogeannis* v. *Superior Court* (1993) 12 Cal.App.4th 668 [15 Cal.Rptr.2d 796] [reduction to government cleanup standard can constitute abatement].)

We accept the general proposition that something less than total decontamination may suffice to show abatability. However, there is no evidence in this case of what that might be. Thus, plaintiffs did not submit evidence of cleanup levels acceptable to or ordered by the regulatory agencies for this property. The evidence showed government standards of acceptable levels of toxic chemicals are benchmarks subject to fluctuation depending upon the government's assessment of a particular site's risk to the public health and environment and the cost of remediation. On appeal, plaintiffs admit "EPA has not yet determined the cleanup levels for this site . . . ." The governmental investigation has not yet reached the point where a health risk assessment can be performed to determine acceptable cleanup levels for the particular site. Thus, plaintiffs cannot rely on any regulatory agency as setting the standard for abatement in this case.

Plaintiff failed to show abatability at any level.

Plaintiffs contend they met their burden by showing (1) the property is contaminated and (2) the technology exists to decontaminate property. This ignores *Mangini I*, which said the extent of contamination was a critical test for finding a continuing nuisance. (230 Cal.App.3d at p. 1148.) Moreover, we do not agree that mere technological feasibility proves abatability.

Plaintiffs argue it is burdensome to require them to prove the exact cost for removing the contamination. Plaintiffs claim that standard was presented in the jury instructions, over their objection. However, the jurors were merely instructed that plaintiffs had to prove the condition could be removed "by reasonable means and without unreasonable expense" and that "hardship and cost" were factors. We see no reason why an estimate would not suffice under the instruction and under the law. Thus, plaintiffs have not shown that they were held to an impossible standard. Moreover, since plaintiffs did not come anywhere close to showing even an estimate of the cost of abatement, this is a nonissue.

Plaintiffs complain about having to show that abatement can be done at a reasonable cost. They dispute Aerojet's reliance on the definition of abatability found in section 839 of the Restatement Second of Torts, which addresses liability of a possessor of land who fails to abate an artificial condition constituting a nuisance on the land in his possession. Comment f to that section provides: "By an 'abatable physical condition' is meant one that reasonable persons would regard as being susceptible of abatement by reasonable means. The law does not require the unreasonable or fantastic, and therefore even though it might conceivably be possible to abate a particular condition, it is not 'abatable' within the meaning of this Section unless its abatement can be accomplished without unreasonable hardship or expense." [Rest.2d Torts, § 839, com. f, p. 162.] Plaintiffs contend section 839 of the Restatement Second of Torts applies only to a possessor of land who did not cause the condition, unlike the situation in the present case.

We need not address plaintiffs' argument because we find sufficient expression of a similar standard in California case law. Thus, our Supreme Court in explaining continuing nuisance has said: "A more difficult problem is presented [] if the defendant is not privileged to continue the nuance or trespass *but its abatement is impractical* . . . . [¶] . . . If the defendant is not privileged to continue the nuisance and is able to abate it, he cannot complain if the plaintiff elects to bring successive actions as damages accrue until abatement takes place. [Citations.] On the other hand, if it appears *improbable as a practical matter that the nuisance can or will be abated*, the

plaintiff should not be left to the troublesome remedy of successive actions. [Citations.]." [](*Spaulding* v. *Cameron* (1952) 38 Cal.2d 265, 268 [239 P.2d 625], italics added.)

■ Thus, our Supreme Court has at least implicitly recognized that "abatable" means reasonably abatable. Additionally, in *Baker* v. *Burbank-Glendale-Pasadena Airport Authority* [(1985)] 39 Cal.3d 862 [218 Cal.Rptr. 293, 705 P.2d 866], the minority opinion noted that the rule followed in this and other states is that the test for continuing nuisance is "whether the nuisance is reasonably abatable." (*Id.* at p. 874 (conc. and dis. opn of Mosk, J.).)

This principle was discussed in *Capogeannis* v. *Superior Court, supra,* 12 Cal.App.4th 668, where the court explained *Spaulding* as follows: "[I]t would be a rare case in which an alleged nuisance could *not* be abated were countervailing considerations (such as expense, time, and legitimate competing interests) disregarded. Thus, for example, in a strictly literal sense even a nuisance represented by an encroaching building or an underlying public utility pipeline might be discontinued or abated, 'at any time,' by tearing down the building or digging up the pipeline. But as *Spaulding* makes clear, it was for just such situations that the concept of permanent nuisance, as an exception to the preexisting rule that all nuisances should be treated as abatable and thus continuing, was developed: Regardless of literal abatability, where as a *practical* matter either abatement or successive lawsuits would be inappropriate or unfair then the nuisance may be regarded as permanent and the plaintiff relegated to a single lawsuit, subject to a single limitation period, for all past and anticipated future harms. . . . Because a literal answer to the question whether a particular nuisance can be discontinued or abated will not invariably serve the purposes of the rules as discussed in *Spaulding,* the discontinued-or-abated rubric should be regarded as no more than a convenient shorthand for the fundamental considerations *Spaulding* outlined." (*Capogeannis, supra,* 12 Cal.App.4th at p. 678, original italics.)

*Capogeannis* noted other courts have implicitly recognized this "practical qualification of a too-literal abatability rule." (12 Cal.App.4th at p. 678.) Thus, the Second District held in *Spar* v. *Pacific Bell*[, *supra,*] 235 Cal.App.3d 1480 [], that the voluntary removal of a nuisance (underground telephone lines) by a defendant before trial did not in and of itself render erroneous the trial court's judgment that the telephone facilities were a permanent nuisance. (*Id.* at pp. 1486-1487.) The facilities had the characteristics of a permanent nuisance—they were intentionally placed to provide service to the public indefinitely (for at least 100 years); it required considerable effort and heavy equipment to install and remove the facilities, which

were 10 feet underground; and the defendant as a public entity might have been able to keep the facilities on the property by paying just compensation. (*Id.* at p. 1486.) *Spar* accordingly affirmed the trial court's judgment that the nuisance was permanent. (*Id.* at p. 1488.)

 Plaintiffs complain that none of the various cited cases refers to the economic cost of cleanup as a litmus test for abatability. However, cost has been placed in issue in this case, and we believe cost is an appropriate factor under the cases we have discussed.

Plaintiffs point out that *Baker* v. *Burbank-Glendale-Pasadena Airport Authority, supra,* 39 Cal.3d 862, considered airport noise to be abatable without considering the cost of abatement. In *Baker*, homeowners brought an action against the operator of a nearby airport, alleging nuisance caused by noise, smoke and vibrations. The trial court sustained the defendant's demurrer on statute of limitations grounds, ruling the nuisance was a permanent nuisance as a matter of law because airport operations are subject to federal law and may not be enjoined by state courts. (*Id.* at p. 868.) The Supreme Court reversed, concluding federal preemption of local regulation of airport noise is not absolute. (*Id.* at pp. 872-873.) Federal law did not preempt local responsibility for airport noise control, and the defendant had a statutory duty under state law to reduce airport noise. (*Ibid.*) Although federal law precluding interference with flight patterns and schedules added an element of permanency to an otherwise continuing problem, it did not mandate that the overall nuisance was a permanent one. (*Ibid.*) Thus, *Baker* concluded the plaintiffs could elect to treat the airport noise as a continuing nuisance. (*Ibid.*)

It is true *Baker* referred to the nuisance as a continuing nuisance without regard for the cost of abatement. However, in *Mangini I*, we said we did not read *Baker* as deviating from the rule that abatability determines the character of the nuisance, because in *Baker* the ability to discontinue the nuisance was implied in the court's discussion that the airport was obligated by statute to curb noise pollution. (*Mangini I, supra,* 230 Cal.App.3d at p. 1146.) We also pointed out the debate in *Baker* related to the question whether injunctive relief must be available in order for a nuisance to be abatable. (*Mangini I, supra,* 230 Cal.App.3d at p. 1146.) We said no such issue was present in this case. (*Ibid.*) Here, the abatability of the contamination presented a question of fact. (*Id.* at p. 1148.) Where abatability is a question of fact, cost is an appropriate factor to consider. Thus, *Baker* does not stand for the

proposition that the contamination in this case was abatable regardless of the cost of decontamination.

Plaintiffs contend "a condition which is unlawful cannot be considered permanent." Their cited authorities do not support this proposition. Thus, plaintiffs claim *Baker* v. *Burbank-Glendale-Pasadena Airport Authority, supra*, 39 Cal.3d 862, held that airport noise pollution was a continuing nuisance as a matter of law *because* the defendant was expressly required by statute to make reasonable efforts to curb noise pollution at the airport. However, the Supreme Court there did not conclude the noise was a continuing nuisance *because* it was unlawful. Rather, the court used the statute to defeat the defendant's claim that its conduct was absolutely privileged. (*Id.* at p. 873.)

Plaintiffs next claim that *Capogeannis* v. *Superior Court, supra*, 12 Cal.App.4th 668, held that contamination exceeding governmental standards must be deemed a continuing nuisance. Not so. The court there, in rejecting an argument that abatement means 100 percent decontamination, said: "We are satisfied to presume that cleanup standards set by responsible public agencies sufficiently reflect expert appraisal of the best that can be done to abate contamination in particular cases." (*Id.* at p. 683.) The court did not suggest that the existence of contamination at levels above the governmental standards must be classified as a continuing nuisance. To the contrary, the court acknowledged the issue presented a factual question. (*Ibid.*)

Plaintiffs also cite *Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265 [288 P.2d 507], which said that since the defendant's ginning mill was lawfully operated in a location properly zoned, it was not subject to injunctive relief to abate it, and plaintiffs could treat it as a permanent nuisance. (*Id.* at p. 271.) *Kornoff* does not stand for the proposition that an unlawful condition cannot be considered permanent. Finally, plaintiffs cite *Tamalunis* v. *City of Georgetown* (1989) 185 Ill.App.3d 173 [134 Ill.Dec. 223, 542 N.E.2d 402], for the supposed proposition that a nuisance may be permanent only if it is a lawful one. However, what the court there said was that a "permanent nuisance is one characterized as continuing indefinitely and the structure constituting the nuisance is a lawful one . . . . [¶] A temporary nuisance is one which is occasional, intermittent, or recurrent and is remediable, removable, or abatable." ([542 N.E.2d] at p. 409.) [] Thus, plaintiffs have failed to persuade us that "unlawfulness," i.e., contamination levels exceeding government standards, automatically establishes a nuisance as a

continuing nuisance, particularly where, as here, a plaintiff does not seek abatement but only money damages.

We conclude "abatable" means that the nuisance can be remedied at a reasonable cost by reasonable means.

As we have recounted, plaintiffs freely admit the absence of evidence to show the extent of the contamination.

The result of the uncertainty regarding the extent of contamination is that it is uncertain whether the nuisance is abatable. Thus, we do not know how much land or water has to be decontaminated. We do not know how deep the decontamination would have to go. We have no idea how much it would cost but know only that it would cost unascertainable millions of dollars.

On this record, there is no substantial evidence that the nuisance is abatable. []

CONCLUSION

We conclude that on this record there is no substantial evidence of a continuing nuisance because there is no substantial evidence that the contamin-ation on plaintiffs' property is reasonably abatable.

The same result applies to the trespass count. []

Establishment of a continuing nuisance or trespass was a necessary condition of plaintiffs' theory of damages. Thus, here plaintiffs sought and were awarded damages for *loss of use* of the property during the three years prior to filing of the complaint. This is a species of damages available only for continuing nuisance. (See *Baker* v. *Burbank-Glendale-Pasadena Airport Authority*, *supra*, 39 Cal.3d at p. 869 ["[I]f a nuisance is a use which may be discontinued at any time, it is considered continuing in character and persons harmed by it may bring successive action for damages until the nuisance is abated. [Citation.] Recovery is limited, however, to actual injury suffered prior to commencement of each action. Prospective damages are unavailable."]; see also *Mangini I*, *supra*, 230 Cal.App.3d at p. 1144.) Since plaintiffs failed to prove a continuing nuisance, damages awarded on that theory may not stand. Accordingly, the trial court erred in failing to grant Aerojet's motion for judgment notwithstanding the verdict and Aerojet is

entitled to entry of judgment in its favor. [End of quote from Court of Appeal.]

## DISPOSITION

As we noted at the outset of this opinion, in affirming the judgment of the Court of Appeal, we limit our decision to the narrow question whether a property owner seeking to maintain a nuisance action for damages after the three-year statute of limitations applicable to permanent nuisances has expired—on the theory that the nuisance is "continuing" or "temporary" in nature—may do so without presenting evidence that the injury is one capable of being abated and that the cost of abatement is "reasonable." We thus have no occasion to consider here a handful of related issues raised by the recent intersection of the ancient law of nuisance and litigation seeking damages or equitable relief for environmental injuries to real property. Those issues—including the question whether a plaintiff-landowner has a power to elect whether to characterize a nuisance as continuing or permanent for statute of limitations purposes[5] and whether the same characterization should apply for both limitations and damages purposes[6] —are matters that can await another day.

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Kennard, J., Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.**—I dissent.

Defendant Aerojet-General Corporation (hereafter Aerojet) disposed of several million pounds of toxic chemicals on property now owned by

---

[5]In its first opinion in this case, the Court of Appeal explicitly recognized both the right of election in close cases and the policy interest in providing a remedy that supports the rule: "In cases of doubt respecting the permanency of an injury caused by a nuisance, courts are inclined to favor the right to successive actions," the Court of Appeal wrote. " '. . . [W]e should be particularly cautious not to enlarge the category of permanent nuisance beyond those structures or conditions that truly are permanent. Where some means of abatement exists, there is little or no incentive to make remedial efforts once the nuisance is classified as permanent.' " (*Mangini I, supra*, 230 Cal.App.3d at p. 1148, quoting *Baker* v. *Burbank-Glendale-Pasadena Airport Authority, supra*, 39 Cal.3d 862, 872.)

[6]See, e.g., *Harrisonville* v. *Dickey Clay Mfg. Co.* (1933) 289 U.S. 334 [77 L.Ed. 1208, 53 S.Ct. 602]; *Spaulding* v. *Cameron, supra*, 38 Cal.2d 265, 268; *Beatty* v. *Washington Metro. Area Transit Authority* (D.C. Cir. 1988) 860 F.2d 1117, 1125 [274 App.D.C. 25]; cf. *Thackery* v. *Portland Cement Co.* (1924) 64 Utah 437 [231 P. 813, 815].

plaintiffs. This fact is undisputed. It was sued by both the United States Environmental Protection Agency (hereafter EPA) and also the People of the State of California (hereafter the People), on behalf of the Department of Health Services, the Hazardous Substance Account, and the Regional Water Quality Control Board. Specifically, the EPA sought to require Aerojet to "identify appropriate response action, if any, to be taken to abate alleged contamination from the Aerojet site . . . and to perform response actions necessary to remedy allegedly hazardous conditions" thereon. The People sought to require Aerojet to reimburse the state for response costs expended in connection with the contamination.[1]

Under a partial consent decree in which it entered in 1988 with the EPA and the People, Aerojet is required to meet specified interim obligations addressing drinking water supply wells and treatment of groundwater, and to complete a "Remedial Investigation/Feasibility Study" to identify and evaluate remedial alternatives for identified public health or environmental problems identified. Aerojet's study apparently will not be completed until 1998; it is therefore not presently known what remediation efforts it will ultimately be required to undertake. According to the expert testimony at trial, however, there are dozens of ways to conduct the cleanup, some "fairly simple"; the company is still evaluating different abatement technologies to find the most cost-efficient method. In the meantime, toxic waste continues to migrate throughout the soil and has leaked from the surface into the groundwater.

The majority, adopting verbatim the opinion of the Court of Appeal, now hold that plaintiffs can recover nothing, either now or in the future, because they have not demonstrated that the contamination of their property can be abated at a "reasonable" cost. They reason that the nuisance must be deemed "permanent" and the claim is, accordingly, time barred.

I disagree. No previous case has required that the costs of remediating a nuisance are dispositive of the issue whether it is "continuing" or "permanent." Moreover, through no fault of plaintiffs, the extent of feasible remediation and its costs may require years to determine. That does not mean, however, that the nuisance in this case cannot or will not eventually be abated—at least to the extent that governmental agencies determine is cost efficient and feasible—and is thus "permanent."

The majority misconstrue the distinction between a "permanent" and "continuing" nuisance. Moreover, by enlarging the category of permanent

---

[1]Aerojet's statutory duty arises, inter alia, under the Comprehensive Environmental Response, Compensation, and Liability Act (hereafter CERCLA), 42 United States Code sections 9601-9675, and Health and Safety Code sections 25316 and 13050, subdivision (p).

nuisances, they effectively reward Aerojet for its own delays in evaluating the costs and methods of remediation efforts that *it is legally required to undertake.*

As Justice Traynor explained in our seminal case, *Spaulding* v. *Cameron* (1952) 38 Cal.2d 265 [239 P.2d 625]: "In early decisions of this court it was held that it should not be presumed that a nuisance would continue, and damages were not allowed for a decrease in market value caused by the existence of the nuisance but were limited to the actual physical injury suffered before the commencement of the action. [Citations.] The remedy for a continuing nuisance was either a suit for injunctive relief or successive actions for damages as new injuries occurred. Situations arose, however, where injunctive relief was not appropriate or where successive actions were undesirable either to the plaintiff or the defendant or both. Accordingly, it was recognized that some types of nuisances should be considered permanent, and in such cases recovery of past and anticipated future damages were allowed in one action. [Citations.]

"The clearest case of a permanent nuisance or trespass is the one where the offending structure or condition is maintained as a necessary part of the operations of a public utility. Since such conditions are ordinarily of indefinite duration and since the utility by making compensation is entitled to continue them, it is appropriate that only one action should be allowed to recover for all the damages inflicted. It would be unfair to the utility to subject it to successive suits and unfair to the injured party if he were not allowed to recover all of his probable damages at once. [Citation.]

"A more difficult problem is presented, however, if the defendant is not privileged to continue the nuisance or trespass but its abatement is impractical or the plaintiff is willing that it continue if he can secure full compensation for both past and anticipated future injuries. To attempt categorically to classify such a nuisance as either permanent or not may lead to serious injustice to one or the other of the parties. Thus, if the plaintiff assumes it is not permanent and sues only for past damages, he may be met with the plea of res judicata in a later action for additional injury if the court then decides the nuisance was permanent in character from its inception. [Citation.] Similarly, if the initial injury is slight and plaintiff delays suit until he has suffered substantial damage and the court then determines that the nuisance was permanent, the defendant may be able to raise the defense that the statute of limitations ran from the time of the initial injury. [Citation.] On the other hand, if the defendant is willing and able to abate the nuisance, it is unfair to award damages on the theory that it will continue. [Citations.]

"Because of these difficulties it has been recognized that in doubtful cases the plaintiff should have an election to treat the nuisance as either permanent

or not. [Citations.] *If the defendant is not privileged to continue the nuisance and is able to abate it, he cannot complain if the plaintiff elects to bring successive actions as damages accrue until the abatement takes place.* [Citations.] On the other hand, if it appears improbable as a practical matter that the nuisance can or will be abated, the plaintiff should not be left to the troublesome remedy of successive actions. [Citations.]" (*Spaulding* v. *Cameron, supra,* 38 Cal.2d at pp. 267-269, italics added.)

We again endorsed the right of election in doubtful cases in *Baker* v. *Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862 [218 Cal.Rptr. 293, 705 P.2d 866]. "In case of doubt as to the permanency of the injury the plaintiff may elect whether to treat a particular nuisance as permanent or continuing. [¶] . . . [¶] . . . [W]e should be particularly cautious not to enlarge the category of permanent nuisances beyond those structures or conditions that truly are permanent. Where some means of abatement exists, there is little or no incentive to make remedial efforts once the nuisance is classified as permanent." (*Id.* at pp. 870, 872.)

The test for classifying nuisances as either continuing or permanent thus turns on whether the nuisance can be abated, or is such that the court will not enjoin its continuance. In this case, Aerojet is *not* privileged to continue the nuisance; nor is it "improbable as a practical matter that the nuisance can or will be abated." (*Spaulding* v. *Cameron, supra,* 38 Cal.2d at p. 268.) Indeed, it has apparently agreed to remediate it. Until that remediation takes place, plaintiffs should be permitted to elect a remedy for "continuing" nuisance. Damages for such "continuing" nuisance are limited, however, to recovery for actual injury suffered within the three years immediately preceding.

The recent case of *Capogeannis* v. *Superior Court* (1993) 12 Cal.App.4th 668 [15 Cal.Rptr.2d 796] correctly applied *Spaulding* in a similar context, also involving contamination of land. There, the property owners brought suit against the previous owners and their tenants for damages from a leaking underground fuel tank. The trial court granted summary adjudication for the defendants, on the ground that the suit was filed more than three years after the plaintiffs discovered the contamination. The Court of Appeal issued a writ of mandate, directing the trial court to vacate its order, and to permit the plaintiffs to proceed in an action for continuing nuisance.

The Court of Appeal emphasized: "[T]oday's environmental awareness establishes beyond argument that there is simply no legitimate interest to be served by permitting this contamination to persist. Conversely, the well-documented tendency of such contamination to migrate, particularly in

groundwater, strongly supports a conclusion that the contamination should be cleaned up as promptly and as thoroughly as possible. Both considerations support application, in this case, of the courts' general preference for a finding of continuing nuisance (or, at least, of a question close enough to empower the [plaintiffs] to proceed upon that theory). Such a finding will tend to encourage private abatement, and perhaps monetary cooperation in abatement efforts, if only to limit successive lawsuits. [Citations.] On the other hand a finding that the nuisance is permanent would leave the [plaintiffs] with private recourse barred, and with no practical motivation to proceed promptly and efficiently beyond that provided by the enforcement practices of governmental agencies acting at public expense. . . . [T]here were in this case none of the 'solid structures' such as buildings, railroads, or pipelines that have supported findings of permanent nuisance in other cases. [Citations.] That in this case abatement efforts may take considerable time and may never be wholly successful should not be permitted to dictate a result that would lessen incentives to proceed as promptly and effectively as possible to abate the contamination." (*Capogeannis* v. *Superior Court, supra,* 12 Cal.App.4th at p. 682.)

In other recent cases involving damage to land from chemical contamination, our Courts of Appeal have similarly allowed plaintiffs to seek relief for a "continuing" nuisance to be abated. (See, e.g., *Newhall Land & Farming Co.* v. *Superior Court* (1993) 19 Cal.App.4th 334, 339-340 [23 Cal.Rptr.2d 377] [plaintiff stated a cause of action for "continuing nuisance" caused by discharge of hazardous substances from a neighboring natural gas processing plant]; *Wilshire Westwood Associates* v. *Atlantic Richfield Co.* (1993) 20 Cal.App.4th 732, 744-745 [24 Cal.Rptr.2d 562] [nuisance from leaking underground petroleum tanks was a "continuing nuisance"]; *KFC Western, Inc.* v. *Meghrig* (1994) 23 Cal.App.4th 1167, 1181 [28 Cal.Rptr.2d 676] [plaintiff entitled to allege that soil contamination constituted a "continuing nuisance"]; see also *Arcade Water Dist.* v. *U.S.* (9th Cir. 1991) 940 F.2d 1265, 1268-1269 [plaintiff entitled to allege that chemical pollution from a military laundry was a "continuing" nuisance].)

In light of the substantial evidence at trial concerning the ongoing spread of hazardous materials on plaintiffs' property and Aerojet's agreement to evaluate and carry out remediation efforts, I cannot agree with the majority that the nuisance is "permanent." I conclude that the nuisance should be deemed "continuing" for statute of limitations purposes. This case raises additional questions of first impression concerning the limits, if any, on potential damages if *complete* abatement of the nuisance proves to be

impossible or unfeasible.[2] Because the extent of the nuisance and the means of abatement are still uncertain, those issues are not, however, presently before us.

For these reasons, I would reverse the judgment of the Court of Appeal and remand with directions that a new trial be ordered limited to the issue of damages.

The petition of plaintiffs and appellants for a rehearing was denied June 20, 1996.

---

[2]Thus, even if Aerojet fully complies with any statutory obligations to remediate the contamination, there may be residual hazardous substances on plaintiffs' property. CERCLA requires that cleanup orders by the EPA be "cost effective," taking "into account the total short- and long-term costs of such actions, including the costs of operation and maintenance for the entire period during which [cleanup] activities will be required." (42 U.S.C. § 9621(a).) Nor may a cleanup order require measures that are "technically impracticable from an engineering perspective." (42 U.S.C. § 9621(d)(4)(C).) Similarly, state law requires the regional water quality control board to evaluate the "cost effectiveness of proposed alternative remedial action measures." (Health & Saf. Code, § 25356.1, subd. (d)(5).) Under such circumstances, a possible approach might be to treat the unabated nuisance as "permanent" for damages purposes. (See *Harrisonville* v. *Dickey Clay Co.* (1933) 289 U.S. 334, 339-341 [77 L.Ed. 1208, 1212-1213, 53 S.Ct. 602] [finding "continuing" nuisance for statute of limitations purposes, but not damages]; *Beatty* v. *Washington Metro. Area Transit Authority* (D.C. Cir. 1988) 860 F.2d 1117, 1125 [274 App.D.C. 25] ["nuisances may be classified for two distinct purposes, one for the assessment of damages, and the other for application of the statute of limitations"].)