**Stuart BARTLESON, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

**Marie PALM; Kenneth E. Palm; Stuart Bartleson; and Vickie Palm, Plaintiffs–Appellees,**

v.

**UNITED STATES of America, Defendant–Appellant.**

Nos. 95–15528, 95–15561.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 15, 1996.

Decided Sept. 25, 1996.

Steve McNichols, Jr., Hallgrimson McNichols McCann, L.L.P., Pleasanton, California; Gerald Mason, San Luis Obispo, California, for plaintiff-appellant-cross-appellees.

Douglas B. Jordan, Attorney, Civil Division, Department of Justice, Washington, D.C., for defendant-appellee-cross-appellant.

Before WIGGINS and TROTT, Circuit Judges, VANCE,* District Judge.

WIGGINS, Circuit Judge:

Stuart A. Bartleson and Marie and Kenneth Palm (collectively "the Palms"), owners

* Hon. Sarah S. Vance, United States District Judge for the Eastern District of Louisiana, sitting by designation.

of large ranches adjacent to Camp Roberts Military Reservation in southern Monterey County, California, filed a claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674, against the United States seeking damages for, *inter alia,* nuisance, arising out of a number of artillery shells from Camp Roberts landing on their property. Relying on a theory of permanent nuisance, the district court awarded $60,000 to Bartleson for diminution in the value of his property, and $150,000 to the Palms for the same. Bartleson appeals, arguing that the district court clearly erred in determining that the diminution in the value of his property was only $60,000. The government cross appeals, arguing that the Palms and Bartleson should have recovered only under a theory of continuing nuisance, and that recovery under a permanent nuisance theory is barred by the two-year FTCA statute of limitations. We have jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## FACTS

With the exception of the amount and type of damages suffered by each landowner, the facts of this case are largely undisputed.

Camp Roberts, a 42,500–acre military installation, has been used by the United States Army and the California National Guard for military training exercises, including artillery fire, since 1941. Between 1971 and 1993, live fire exercises were conducted at Camp Roberts on an average of 200 times per year. During the 1970s, about 20,000 to 30,000 artillery rounds were fired per year. That rate continued throughout the early 1980s, until the number of artillery rounds fired at Camp Roberts increased to 60,000 per year in 1985–86. After 1986, the number of shells fired declined to approximately 40,-000 per year. After an infantry division was moved from Camp Roberts to Fort Lewis, Washington in 1993, the artillery firing days dropped to approximately sixty per year.

Residents of the area around Camp Roberts are generally aware of the artillery firing at Camp Roberts because of the noise and vibrations caused by the activity. While there is a buffer zone between the Camp Roberts artillery range and private property, stray shells have occasionally landed on private property due to human error or a defective powder charge. The first recorded incident or incidents occurred in the late 1970s. The measures taken after such incidents in the late 1980s included raising the minimum firing angle, closing some firing points that were closest to Camp Roberts' boundaries, and the restriction of certain types of artillery to certain firing points. The military cannot absolutely guarantee that future firing mishaps will never occur again at Camp Roberts.

In 1981, the Palms spent $275,000 to acquire a 490–acre ranch, bounded on the east by Camp Roberts, on which they lived and farmed. A neighbor testified that in the late 1970s, several flares fired from Camp Roberts landed on what later became the Palms' property and one flare burned about twenty acres. In 1981 or 1982, artillery fire caused a fire that burned a portion of the Palms' land, for which the Palms were compensated; the fire may have started on Camp Roberts. In July or August of 1985, two shells hit the Palms' property. The Palms alleged numerous incidents of shelling between 1988 and 1990: nine shells landing on the property on June 14, 1988; two shells exploding on the property on April 29, 1989, including one that was less than 200 yards from their residence; one round landing on the property in November 1989; one round landing in April 1990; and several projectiles landing on their property on or about May 21, 1990. The Palms also alleged helicopter overflights and landings on their property on two dates in May and August 1990, overflights of high performance military aircraft during the summer and autumn of 1991, and the discovery of a practice bomb on the property in 1991. On September 7, 1989, the Palms filed an administrative claim under the FTCA with the Army, which they deemed denied by operation of law after six months. The Palms filed their complaint for, *inter alia,* nuisance against the government on March 13, 1990. The property was sold at a foreclosure sale

on April 20, 1994, to another individual.[1]

Bartleson owns, but does not live on, a 1,182–acre ranch that he purchased for $1,300,000 in June 1989. The ranch consists of 310 acres of irrigated alfalfa and 872 acres of grazing land. It has been improved with a trailer home, barns, fences, and corrals. Bartleson knew that Camp Roberts was adjacent to his property before he purchased it, but said he had no reason to believe that it might be subject to shelling. According to government witnesses, a shell had landed on the property in 1980 or 1982. In 1987, other incidents of shelling occurred, about which the resident managers complained to their United States Congressman. Additional shelling of the property was experienced or discovered on March 16, May 12, June 7, and September 22, 1988. Bartleson made an offer for the property on May 23, 1988, and took possession on June 29, 1988. Bartleson testified in his deposition that he learned from the resident managers of past shellings of the ranch on about June 1, 1988, before he closed on his purchase of the property. Bartleson testified at trial, however, that he had erred in his deposition when he indicated that he was informed of the shelling before closing on the property. He did not ask the sellers about the shelling before the sale closed.

In addition to the September 22, 1988 incident, during which eight illumination artillery canisters landed in an alfalfa field on the ranch, another canister landed in an alfalfa field on February 25, 1989, and was retrieved by the Army. On June 14, 1989, a 203–millimeter shell landed on Camp Roberts property and skipped 3500 meters onto Bartleson's ranch, landing in a freshly plowed field. An Army demolition team blew up the unexploded shell at the site, leaving a crater in the field. On June 27, 1989, a 105–millimeter round hit Bartleson's property. On October 4, 1990, Bartleson submitted an Administrative claim to the Army under the FTCA, which he deemed denied as a matter of law

after six months. He filed his complaint for, *inter alia,* nuisance against the United States on April 24, 1991.

The two cases were consolidated in January 1992. On April 13, 1994, the district court ruled on the government's motion to dismiss Plaintiffs' claims for nuisance or, alternatively, for partial summary judgment. Relying on the plaintiffs' power to elect whether a nuisance is treated as continuing or permanent, the fact that the shelling activities could not be enjoined, and the fact that the government could not guarantee that future incidents would not occur, the court determined that the plaintiffs could proceed under a permanent nuisance theory. In addition, the district court concluded that even though there was evidence of shelling on the two properties more than two years prior to the plaintiffs' filing of their FTCA administrative claims with the Army, their "claims for permanent nuisance did not accrue until sometime in 1989 or 1990. It was not until that time, after receiving contradictory assurances from various government officials regarding the abatability of the firings, that Plaintiffs can reasonably be assumed to have known the full scope of the nuisance impairing their property."

A bench trial was held on October 31–November 2, and November 7–8, 1996. In addition to testimony from the plaintiffs, their neighbors, and the Army regarding the activities at Camp Roberts and the shelling of the plaintiffs' property, the district court heard two widely divergent estimates regarding the diminution in the value of Bartleson's property as a result of the stray shells.[2] Both parties concluded that the highest valued and best use for Bartleson's property was its present use-grazing cattle and growing grain. Bartleson's appraiser, Tom H. Pettit, who was born and reared in the Camp Roberts area and is a member of the American Society of Farm and Rural Appraisers, concluded that the diminution in the value of

---

**1.** The district court found that this foreclosure was not a direct consequence of the actions of the government.

**2.** The Palms do not appeal the amount of damages awarded to them by the district court. While the government appeals the treatment of

both plaintiffs' claims as a permanent nuisance claim, it does not appeal the damages awarded to the Palms, assuming permanent nuisance was the proper theory. Thus, only the valuation of Bartleson's property is at issue.

Bartleson's property was at least $587,800. In addition, Pettit concluded that an environmental review of the property, which would cost between $5,000 and $250,000, would have to be made because of alleged unrecovered shells on the property. Dean Stahr, the government's appraiser, concluded that there was no diminution in value of Bartleson's property as a result of shells landing on the property because before the shellings in the late 1980s, the market had already accounted for the property's proximity to the Camp Roberts artillery range and the risk of shelling.

In his oral findings issued on November 8, 1994, Judge Ware concluded that stray artillery round incidents prior to 1988 were so infrequent that sellers of property adjacent to Camp Roberts did not have a duty to disclose such incidents to purchasers. In light of increased stray artillery in 1988 and 1989, the owners of such property would have a duty to disclose such incidents to potential purchasers. Thus, the court concluded that in April 1989, a permanent nuisance came into existence on the Palms' and Bartleson's properties. The court awarded $15,000 to Kenneth and Marie Palm for mental anguish and $5,000 to their daughter for the same. In addition, the Palms were awarded $10,000 for interference with the use of their property, and $150,000 for diminution in the value of their property. The court awarded Bartleson $5,000 for interference with the use of his property, and, finding that the reduction in the value of his property was not as dramatic as that suffered by the Palms, awarded him $60,000 for diminution in the value of his property. The court denied the plaintiffs' motion to alter or amend the judgment on January 19, 1995.

## DISCUSSION

### I. STANDARD OF REVIEW

Questions of state law are reviewed *de novo*. *National Union Fire Ins. Co. v. Showa Shipping Co.*, 47 F.3d 316, 322 (9th Cir. 1995).

■ "Determining the appropriate statute of limitations is a question of law reviewed de novo." *Mendez v. Ishikawajima-*

*Harima Heavy Indus. Co.*, 52 F.3d 799, 800 (9th Cir.1995). However, where "the accrual of the statute of limitations in part turns on what a reasonable person should have known, we review this mixed question of law and fact for clear error." *Rose v. United States*, 905 F.2d 1257, 1259 (1990).

■ "We review the district court's computation of damages following a bench trial for clear error." *Howard v. Crystal Cruises, Inc.*, 41 F.3d 527, 530 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1796, 131 L.Ed.2d 724 (1995).

### II. THE CHOICE BETWEEN PERMANENT AND CONTINUING NUISANCE

■ The FTCA dictates that state law determines the federal government's tort liability. *See* 28 U.S.C. § 2674 (1994); *Arcade Water Dist. v. United States*, 940 F.2d 1265 (9th Cir.1991). Thus, California nuisance law governs this case. The government argues that the district court erred by allowing the plaintiffs to proceed under a permanent nuisance theory rather than a continuing nuisance theory. Because there is doubt about the permanency of the plaintiffs' nuisance injuries in this case and California law allows the plaintiff to choose whether to treat a particular nuisance as permanent or continuing in such a situation, the district court correctly allowed the plaintiffs to proceed on a permanent nuisance theory.

■ California law defines a nuisance as "[a]nything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property...." Cal.Civ.Code § 3479 (West 1970). Nuisances are classified as either permanent or continuing.

> On the one hand, permanent nuisances are of a type where "by one act a permanent injury is done, [and] damages are assessed once for all." The cases finding the nuisance complained of to be unquestionably permanent in nature have involved solid structure, such as a building encroaching upon the plaintiff's land, a steam railroad operating over plaintiff's land, or regrade

of a street for a rail system. In such cases, plaintiffs ordinarily are required to bring one action for all past, present and future damage within three years after the permanent nuisance is erected.... Damages are not dependent upon any subsequent use of the property but are complete when the nuisance comes into existence.

On the other hand, if a nuisance is a use which may be discontinued at any time, it is considered continuing in character and persons harmed by it may bring successive actions for damages until the nuisance is abated. Recovery is limited, however, to actual injury suffered prior to commencement of each action.

The classic example of a continuing nuisance is an ongoing or repeated disturbance, such as ... noise, vibration or foul odor. Indeed, even more substantial physical invasions of land have been held to be continuing in character.... [T]he distinction to be drawn is between encroachments of a permanent nature erected upon one's lands, and a complaint made, not of the location of the offending structures, but of the continuing use of such structures. The former are permanent, the latter is not.

In case of doubt as to the permanency of the injury the plaintiff may elect whether to treat a particular nuisance as permanent or continuing.

*Baker v. Burbank–Glendale–Pasadena Airport Authority,* 39 Cal.3d 862, 218 Cal.Rptr. 293, 297–98, 705 P.2d 866, 870–71 (1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986) (citations and footnotes omitted). "Whether a nuisance will be classified as continuing or permanent depends not on the offending party's interest in continuing the nuisance, but on the type of harm suffered." *Id.* 218 Cal.Rptr. at 297, 705 P.2d at 869.

■ Whether the nuisance alleged by the plaintiffs is more appropriately permanent or continuing is unclear. A nuisance is generally considered to be continuing if it can be discontinued or abated. *Mangini v. Aerojet–General Corp.,* 12 Cal.4th 1087, 51

Cal.Rptr.2d 272, 278, 912 P.2d 1220, 1226 (1996).[3] A nuisance is also generally considered continuing if it is "an ongoing or repeated disturbance," such as a disturbance "caused by noise, vibration or foul odor," *Baker,* 218 Cal.Rptr. at 298, 705 P.2d at 870, that "may vary over time." *Spar v. Pacific Bell,* 1 Cal.Rptr.2d 480, 482–83, 235 Cal. App.3d 1480, 1485 (1991).

The individual shellings of the plaintiffs' property have the appearance of a continuing nuisance. Individual shelling appears to be abatable; there have been no stray shellings since 1992, likely due in part to the government's closing of certain firing points and an infantry division's transfer from the base in 1993, which has decreased the number of days that the range is used. The occasional landing of shells on the plaintiffs' properties is a repeated disturbance that has varied over time.

■ Viewed as a whole, however, the presence of a military base that has occasionally shelled the plaintiffs' property and cannot assure that future shellings will not occur, has aspects of a permanent nuisance. In a way, the firing range itself has been physically extended onto the plaintiffs' properties, much like a building inadvertently constructed in part on the plaintiffs' properties, a situation treated as a permanent nuisance. The main injury alleged by the plaintiffs was the diminution in their property values due to the stigma caused by the past shelling of their properties and the uncertainty regarding future shelling and the possible presence of unexploded shells on the properties. Damages for diminution in property value due to stigma have been recognized by the California courts in cases of permanent nuisance. *See Santa Fe Partnership v. Arco Prods. Co.,* 54 Cal.Rptr.2d 214, 220–21, 46 Cal.App.4th 967, 977–78 (1996) (recognizing that many courts have begun to recognize stigma damages, but not in continuing nuisance cases); *Alexander v. McKnight,* 9 Cal. Rptr.2d 453, 455–56, 7 Cal.App.4th 973, 977 (1992) (recognizing that history of nuisance could negatively affect price of property, but

**3.** *See also Wilshire Westwood Assoc. v. Atlantic Richfield Co.,* 24 Cal.Rptr.2d 562, 569, 20 Cal. App.4th 732, 744 (1993); *Capogeannis v. Superi-* *or Court,* 15 Cal.Rptr.2d 796, 804, 12 Cal.App.4th 668, 681 (1993).

concluding that damages for diminution in value of property were not appropriate where nuisance had been enjoined); *San Diego Gas & Elec. Co. v. Daley,* 253 Cal.Rptr. 144, 150–53, 205 Cal.App.3d 1334, 1345–49 (1988) (recognizing that negative public perception of electrical wires affected property value and entitled landowner who had a portion of his land condemned by utility for construction of wires to compensation for damage to property value of the remainder of his land); *see also F.D.I.C. v. Jackson–Shaw Partners No. 46, Ltd.,* 850 F.Supp. 839, 844 (N.D.Cal.1994) (concluding that under California law, plaintiff could likely recover damages relating to stigma caused by contamination of property if permanent nuisance claim was not barred by the statute of limitations). While the individual shellings appear to have been abated, the risk of future shellings remains, and the stigma caused by the location of the plaintiffs' property near a shelling range that has a history of misfirings will likely not be abated unless the range is closed completely. The record reveals that the closing of the artillery range is not likely. Moreover, the uncertainty regarding unexploded shells on the properties will not be abated even if the artillery range does close.

"It has been stated '[t]he clearest case of a permanent nuisance or trespass is the one where the offending structure or condition is maintained as a necessary part of the operations of a public utility.'" *Spar,* 1 Cal. Rptr.2d at 482, 235 Cal.App.3d at 1484 (quoting *Spaulding v. Cameron,* 38 Cal.2d 265, 239 P.2d 625, 627 (1952)).

> Since such conditions are ordinarily of indefinite duration and since the utility by making compensation is entitled to continue them, it is appropriate that only one action should be allowed to recover for all the damages inflicted. It would be unfair to the utility to subject it to successive suits and unfair to the injured party if he

were not allowed to recover all of his probable damages at once.

*Spaulding,* 239 P.2d at 627–28. "[I]f it appears improbable as a practical matter that the nuisance can or will be abated, the plaintiff should not be left to the troublesome remedy of successive actions." *Id.* at 628. Because the artillery range is an instrument of the government that cannot be enjoined, like a public utility, and the shelling activities will continue, it was appropriate to treat the nuisance as permanent and resolve the plaintiffs' damages in one suit. Although some elements of the nuisance favor treatment as a continuing nuisance, because the issue is unclear, the district court properly allowed the plaintiffs to proceed under a permanent nuisance theory.

### III. STATUTE OF LIMITATIONS

█ The government argues that because the statute of limitations for a permanent nuisance claim runs from the time of the creation of the nuisance under California law, and because the plaintiffs were aware of shells hitting their property more than two years before they filed their administrative complaints under the FTCA, a permanent nuisance claim would be barred by the FTCA's two-year statute of limitations. Because federal law governs the accrual of the statute of limitations under the FTCA and provides for a "discovery" rule, we reject the government's argument.

█ A tort claim against the United States must first be presented in writing to the appropriate federal agency within two years of its accrual, and suit must be brought within six months of denial of the claim by the agency to which it was presented. 28 U.S.C. § 2401 (1994). The date on which an FTCA claim accrues is determined by federal law. *Landreth v. United States,* 850 F.2d 532, 533 (9th Cir.1988), *cert. denied,* 488 U.S. 1042, 109 S.Ct. 866, 102 L.Ed.2d 990 (1989).[4]

---

4. Though we stated in *Arcade Water Dist.* that "California state law … both establishes Arcade's claim and governs application of the two-year statute of limitations," 940 F.2d at 1267, that case did not deal with the *accrual* of the statute of limitations, because the plaintiff clearly knew of its nuisance injury more than two years before it filed its administrative complaint under

the FTCA. Our statement regarding California law was explained by a later statement: "If this nuisance was 'permanent,' as defined by California law, more than two years before Arcade filed its administrative claim, then the claim is time-barred." *Id.*

We have found no authority to indicate that there are any situations in which federal law

An FTCA claim "accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its cause." *Id.; see also United States v. Kubrick,* 444 U.S. 111, 120–22 & n. 7, 100 S.Ct. 352, 358–60 & n. 7, 62 L.Ed.2d 259 (1979); *Gibson v. United States,* 781 F.2d 1334, 1344 (9th Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987).

Artillery shells hit the Palms' property as early as the late 1970s and Bartleson's property no later than 1987, and they were both aware of shelling of their properties by 1981 and 1987, respectively. According to the district court, however, the nature of the injury to their property did not become apparent to the Palms or Bartleson until April 1989, and thus their administrative complaints under the FTCA, made in September 1989 and October 1990, respectively, were timely. The district court found that prior to 1988, the shelling of the two properties was "so infrequent that they did not get to the point where property owners came under a duty to disclose to those who would acquire an interest in their property that the property had been shelled." With the numerous shelling incidents in 1988 and 1989, however, it became "incumbent upon those owners to disclose to future people who would wish to acquire an interest in the property that nature, extent and actuality of shelling." The district court found that because the plaintiffs at first received contradictory assurances from the government regarding abatement of the shelling, a permanent nuisance did not come into effect until April 29, 1989. This resulted in a diminution in the value of the plaintiffs' properties.

The district court's conclusions regarding the accrual of the statute of limitations are based on the shellings evidenced in the record, and the reasonable conclusion that diminution in property value would not occur until the plaintiffs realized that they could not be given assurances regarding future shelling and that they would be required to report such shelling to future purchasers. It

is at that point that the plaintiffs should have been expected to discover that the nuisance was "permanent." The district court's conclusion about the accrual of the statute of limitations was not clearly erroneous, and thus we reject the government's argument that a permanent nuisance claim is barred by the statute of limitations.

## IV. SUFFICIENCY OF DAMAGES AWARDED TO BARTLESON

■ Bartleson argues that the district court erred by determining that his damages for permanent nuisance were only $60,000, or about $50 per acre on his ranch. We reject Bartleson's argument.

Bartleson argues that under Fed.R.Evid. 703, the testimony of the government's expert, Dean Stahr, was entitled to no weight because his assumption and conclusions did not rest on an adequate basis. Rule 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Rule 703 "does not deal with the authority of the court to scrutinize an expert's methodology or reasoning." *Claar v. Burlington Northern R.R. Co.,* 29 F.3d 499, 501 (9th Cir.1994). "Rule 703 merely relaxes, for experts, the requirement that witnesses have personal knowledge of the matter to which they testify." *Id.* It is Rule 702, which allows, and requires, the district court to evaluate the reasoning and methodology underlying expert testimony. *Id.*

Even though Bartleson fashions his objections to Stahr's testimony as a weight of the evidence argument, by arguing that Stahr's testimony is entitled to no weight under the Rules of Evidence, Bartleson is essentially arguing that Stahr's testimony was inadmissible. Bartleson did not, however, object to

---

does not govern the accrual of an FTCA claim. As in *Arcade,* if the nuisance created by Camp Roberts was permanent more than two years

before the plaintiffs filed their FTCA administrative claims, they cannot proceed under a permanent nuisance theory.

the admissibility of Stahr's testimony either before it was admitted, or before the district court rendered its judgment. "By failing to object to evidence at trial and request a ruling on such an objection, a party waives the right to raise admissibility issues on appeal." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir.1996) (holding that even though a challenge to expert scientific evidence was couched as an insufficiency of the evidence argument, it was really an objection to the admissibility of evidence under Fed. R.Evid. 702, which was waived by not being raised at trial). By failing to object to the admissibility of Stahr's testimony and request a ruling by the district court before it rendered its judgment, Bartleson denied Stahr the opportunity to lay a better foundation for his testimony, and potentially denied the government the opportunity to introduce other evidence on the issue of the property's value. *See id.* at 1067; *Fenton v. Freedman*, 748 F.2d 1358, 1360 (9th Cir.1984). Thus the argument that Stahr's testimony should be given no weight has been waived.

■■■ The district court's conclusion about the amount of damages is not clearly erroneous. There was evidence from which the district court *could have* concluded that Bartleson's damages were more than $60,000. The plaintiffs' expert testified that due to the stigma resulting from the shelling he believed that the irrigated farming land on Bartleson's property would be reduced in value from $2700 per acre to $1000 per acre.[5] This reduction in value of the farming land would cause a total loss of $587,800 to Bartleson. Pettit believed that a landowner would only be able to get a mortgage of fifty to sixty percent of the value of the land, instead of the typical sixty to seventy percent available on most ranches, because of the shelling. Pettit also believed that a Phase One Environmental Report would be required by any prospective purchaser or lending institution. Such a report, usually done to assess whether there are hazardous materials in soil, would require a review of documents regarding stray shelling and an inspection of the land. Lending institutions questioned by

Pettit indicated that they would require a Phase One report if they knew about a history of shelling on a property. Such a report would cost somewhere between five and fifty thousand dollars. A Phase Two environmental review, designed to abate the hazardous materials on a property, could cost two hundred thousand dollars.

There was substantial evidence to support a finding that Bartleson's damages were not so severe, however. Both experts testified that the property's best use was for grain and grazing. Joseph Mustone, whose property is located between Bartleson's and the Palms' properties, testified that his property had been shelled, that he believed he had about six artillery shells on his property, and that he did not believe the shells reduced the value of his property because he only used it to raise cattle. A property manager of another nearby property that had been hit by a shell also testified that he did not believe the shelling damaged the property's value.

Dean Stahr, the government's expert and a real estate appraiser with experience appraising properties where stigma has been claimed, conducted over fifty interviews and analyzed the sales of thirteen properties located close to Camp Roberts and sixty-nine located farther from Camp Roberts. He concluded that there had been no change in value after the shelling of Bartleson's property because the real estate market had already taken the risk of shelling at properties located near Camp Roberts into account. Stahr concluded that shelling does not seem to impact agricultural uses, and that shelling was not an item that affected the bargain between sellers and buyers. Bartleson himself stated in his deposition that he was aware of the shelling after he made an offer for the property but before he closed on the purchase in June 1989, but did not indicate that the shelling affected the purchase price.

· Bartleson argues that the district court's finding of damages was clearly erroneous in light of the fact that the Palms were awarded approximately $300 per acre, while he was awarded only $50 per acre. However, even Bartleson's expert indicated that only 311 of

---

5. He did not believe that the range land on Bartleson's property, which was not directly impacted by the shelling, would be affected in value. *Id.*

Bartleson's acres were impacted by the shelling. Thus, the damages awarded to Bartleson were closer to $200 per acre for the affected acres. Moreover, the shelling of Palms' property was more substantial, thus creating a greater stigma on the property, and the Palms also endured helicopter landings on their property and plane overflights that Bartleson did not endure because he did not live on his property.

Despite the alleged significant reduction in the value of his land, Bartleson has spent over $149,000 on improving the land since he became aware of the shelling. The shelling did not have any effect on Bartleson's alfalfa production. Pettit admitted that he was only speculating that a Phase One report would be required for Bartleson's property, and admitted that no lending institution indicated that a Phase Two report would be required. Mustone, Bartleson's neighbor, did not seem concerned about the apparent presence of shells on his property.

Bartleson makes much of the fact that Stahr's estimation of the diminution in value of Bartleson's property was based on conjecture because Stahr could not point to any properties that had been sold after they had been subjected to shelling. However, Pettit's estimate was equally based on conjecture because he did not have any sales of shelled properties to rely on in making his estimate of a $1700 per acre diminution in value. In light of testimony from the government's expert and two local property owners that the shelling did not affect the value of the land and the fact that Bartleson made improvements on the land after the shelling and had not had his ranching or cattle farming operation interrupted, the district court's awarding of $60,000 in damages was not clearly erroneous.

## CONCLUSION

For the reasons stated above, we AFFIRM the district court's decision to allow the plaintiffs to proceed on a permanent nuisance theory, and the damages awarded to Bartleson.