Filed 7/24/24  Hari Hara v. Team Enterprises CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| HARI HARA, LLC,<br>　　　Plaintiff and Appellant,<br><br>　　v.<br><br>TEAM ENTERPRISES, LLC,<br><br>　　Defendant and Respondent. | B326440<br><br>(Los Angeles County<br>Super. Ct. No. PC058126) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Melvin D. Sandvig, Judge.  Reversed and remanded with directions.

Paladin Law Group, Bret A. Stone, and Kirk M. Tracy for Plaintiff and Appellant.

Horvitz & Levy, Steven S. Fleischman, Scott P. Dixler; Greben Law Office and Jan A. Greben for Defendant and Respondent.

Plaintiff Hari Hara, LLC (Hari Hara) purchased commercial property previously occupied for decades by a series of dry cleaning tenants. Years after the purchase, Hari Hara sued one of those tenants, Team Enterprises, LLC (Team), seeking damages for environmental contamination of the property. In a prior appeal, this court reversed summary judgment in Team's favor, which the trial court entered based on a prior landlord's purported release of claims for environmental contamination.[1] On remand, the trial court granted summary judgment based on additional evidence of the parties' intent with respect to the release and on the alternative ground that Hari Hara's claims are time-barred. We consider two issues: whether Team has demonstrated the release is binding upon Hari Hara and whether, and to what extent, Hari Hara's claims are time-barred.

## I. BACKGROUND

### A. *The Complaint*

Hari Hara commenced this action in 2017. The operative first amended complaint, filed in 2018, alleges Hari Hara was the owner of commercial property in Santa Clarita, California, at which Team operated a dry cleaning business from 1967 through 1995. The gist of the complaint is that Team released hazardous substances and waste into the environment, which caused Hari Hara to incur "monitoring, investigation, remediation, and response costs in determining the scope of the contamination in the indoor air, soil, soil vapor, and groundwater." The operative

---

[1] *Hari Hara, LLC v. Team Enterprises, LLC* (Sept. 29, 2021, B306217) [nonpub. opn.] (*Hari Hara I*).

2

complaint alleges causes of action for contribution under the Hazardous Substance Account Act (HSAA),[2] equitable contribution, abatement of a public nuisance, abatement of a private nuisance, negligence, continuing trespass, and declaratory relief.[3]

### B. Team's First Motion for Summary Judgment

In April 2019, Team moved for summary judgment on the ground that Hari Hara is bound by a settlement agreement the property's former owner, Mark Weinstein (Weinstein), signed to resolve a federal lawsuit.[4] Alternatively, Team contended all of Hari Hara's causes of action—save the HSAA cause of action—are time-barred.

With respect to its release-based defense, Team submitted evidence of the history of environmental contamination on the property and efforts to resolve it.

---

[2]     The Hazardous Substance Account Act is presently codified at Health and Safety Code section 78000 et seq. At the time Hari Hara filed its complaint, it was codified at Health and Safety Code section 25300 et seq.

[3]     Hari Hara alleged the same causes of action, plus a seventh cause of action for breach of contract, against Hueng Kyu Jang (Jang), who operated a dry cleaning business at the property from 1999 through the date of the operative complaint. Hari Hara later dismissed Jang, and he is not a party to this appeal. As we shall discuss, Jang was a party to the purported release and signed a declaration in support of Team's second motion for summary judgment.

[4]     Weinstein executed the agreement as trustee of the Weinstein Family Trust Dated March 20, 1997.

3

Weinstein discovered perchloroethylene (PCE) contamination at the property in 1998. The Los Angeles County Fire Department and Regional Water Quality Control Board (Control Board) took charge of investigating the contamination in the soil and groundwater. In 1999, Weinstein's environmental consultant requested the Control Board "grant site closure" because soil remediation would only be required if the commercial space were to be remodeled. The Control Board granted the request on the condition that Weinstein record a deed restriction. The Control Board also maintained the "removal of contaminated soil (soil remediation) will be required during any future construction, demolition, or use change" affecting the dry cleaner unit of the property.

Weinstein would not accept the deed restriction. His consultants thereafter excavated parts of the property and removed soil containing certain levels of PCE. However, they left in place bedrock that was "difficult to remove with conventional excavation equipment." The Control Board thereafter granted site closure, concluding in a "No Further Action" letter issued in November 2000 that the residual PCE in the bedrock was "relatively immobile, and d[id] not pose a threat to groundwater quality." The Control Board did not address in the No Further Action letter the deed restriction it earlier proposed, and there is no evidence in the record indicating any deed restriction was recorded.

Weinstein sued Team and others in federal court to recover costs of the cleanup and the associated diminution in the value of the property. In 2002, the parties executed a "MUTUAL RELEASE AND SETTLEMENT AGREEMENT" (the Settlement

4

Agreement). A section entitled "RELEASE OF ALL PARTIES BY WEINSTEIN" provided, among other things, that:

> "[i]n consideration for the monies paid to WEINSTEIN in accordance with [another section of the Settlement Agreement], WEINSTEIN, for himself and his agents, affiliates, predecessors, successors and assigns, hereby agrees to execute and file with the court, a Stipulation and Order signed by all parties and attached hereto as Exhibit '1', dismissing the Complaint and all other related pleadings in this litigation with prejudice and releasing and forever discharging the parties to the WEINSTEIN LITIGATION . . . from all matters related to any environmental contamination of the premises and including all environmental matters related to the WEINSTEIN LITIGATION that were or could have been asserted in that litigation . . . . This [Settlement Agreement] specifically includes, but is not limited to, any release of PCE . . . at or from, the PROPERTY. WEINSTEIN shall file the above noted Stipulation and Order with the Court no later than five (5) business days after the receipt of all for [sic] monetary payments to be made to WEINSTEIN . . . ."

The Settlement Agreement further provided that Team would pay Weinstein $65,000.

Team's motion for summary judgment did not include a copy of "Exhibit 1" mentioned in the Settlement Agreement. Hari Hara opposed Team's summary judgment motion and argued it was not bound by the terms of the Settlement Agreement. Hari Hara further argued that Team waived its separate statute of

5

limitations defense because it did not plead the specific subdivisions of the relevant statutes that, according to Team, operated to bar the action.

The trial court granted summary judgment, finding the Settlement Agreement was binding on Hari Hara as Weinstein's successor. The court did not address Team's statute of limitations defense.

### C. Reversal and Remand

Hari Hara appealed the summary judgment ruling and this court reversed. As to the Settlement Agreement—the only basis for the trial court's order granting summary judgment—the panel reasoned that "[b]ecause Team did not furnish a copy of Exhibit 1 [to the Settlement Agreement] with its moving papers—or proffer other evidence that would explain the omission of the exhibit or otherwise establish no triable issue of fact exists on the question of whether Team was effectively released from liability—we can only guess at whether liability is precluded on contractual grounds." As to Team's statute of limitations argument, the panel determined the trial court should address that issue "in the first instance."

The panel's disposition remanded "for further proceedings consistent with this opinion." The opinion emphasized "the parties may choose if and when to raise in the trial court the statute of limitations and related pleading defects, as well as any additional evidence bearing on the existence of a consummated settlement and valid contractual release." The panel recognized Team could present additional evidence of a valid contractual release "by inclusion of Exhibit 1 or otherwise."

6

*D.      Team's Motion for Leave to File an Amended Answer*

On remand, Team moved for leave to file an amended answer citing applicable statutes of limitation and adding supporting facts.[5]  Hari Hara opposed the motion, arguing Team did not promptly move for leave to amend in good faith, Hari Hara would be prejudiced by permitting Team to assert a defense "Hari Hara long ago understood Team to have waived," Team had not shown it would be prejudiced if not given leave to amend its answer, and Team failed to comply with certain requirements for motions for leave to amend.

The trial court granted Team's motion to file an amended answer.  It determined, among other things, that Team promptly filed its motion after the case was remanded, procedural defects in the motion did not warrant denying it, and the proposed amendments cured technical defects in the original answer (which, in any event, was sufficient to put Hari Hara on notice that Team was asserting a statute of limitations defense).

*E.      Team's Second Motion for Summary Judgment*

Team subsequently filed a second motion for summary judgment or summary adjudication.  The motion was based on essentially the same two theories asserted in the original motion for summary judgment: Hari Hara was bound by Weinstein's release of claims against Team and all of Hari Hara's causes of action are time-barred (a change from its earlier position that all but the HSAA claim were barred).

---

[5]      Team also sought leave to file an amended cross-complaint, which is not relevant to this appeal.

7

### 1. *Settlement Agreement*

Team submitted evidence reflecting the parties' understanding of the effect of the Settlement Agreement and explaining why the contemplated Exhibit 1 was never finalized. Among other things, Team submitted declarations by Perry Hughes (Hughes) (Weinstein's attorney in the federal lawsuit), Thomas Jones (Jones) (Team's president in 2002, who executed the Settlement Agreement), Jonathan Kassel (Kassel) (a co-defendant in the federal lawsuit), and Jang (a co-defendant in this case and the federal lawsuit). Team also submitted a draft Exhibit 1 circulated among the parties in 2002 that does not include any release language.[6] In broad strokes, Team contended the evidence demonstrated the parties to the Settlement Agreement intended that document to release Weinstein's claims and its effectiveness was not conditioned on the filing of Exhibit 1.

More specifically, Team maintained that in December 2001, after the parties in the federal matter notified the district court they had reached a settlement, the district court dismissed the action without prejudice to any party reopening the action if the settlement was not consummated within 60 days. In February 2002, the district court issued an order extending the 60-day period by 45 days because although "the parties ha[d] negotiated and finalized the terms of the Settlement Agreement," it had not yet been signed by all parties and the defendants had not yet made the contemplated payments to Weinstein. Team paid

---

[6]     The draft Exhibit 1 states in pertinent part that the parties "do hereby each stipulate and agree to dismiss with prejudice all pleadings that have been filed by any party in this action."

Weinstein the $65,000 it owed under the Settlement Agreement in March 2002. In April 2002, the district court issued an order extending the period to reopen the action by an additional 30 days because although the parties had now "entered into a Settlement Agreement," two of the defendants still had not paid Weinstein. The Settlement Agreement was attached as an exhibit to the April 2002 order. Hughes (Weinstein's attorney) eventually received payment from all of the defendants and, because "the district court had already dismissed the case, the time to set aside the dismissal had passed, and the parties completed the settlement obligations (e.g., paying the settlement sums in exchange for a complete release)," he believed all "parties understood that filing 'Exhibit 1' would be redundant and unnecessary."

Team argued that Hari Hara was bound by the Settlement Agreement as Weinstein's "successor" and consented to the agreement by "knowingly accept[ing] the benefits of the transaction . . . ."[7] Alternatively, Team argued Hari Hara had constructive notice of the Settlement Agreement.

Team submitted a declaration by Peter Krasnoff (Krasnoff), an engineer, who faulted Hari Hara's environmental due diligence in various respects. Krasnoff averred that a reasonable inquiry would have conformed to the American Society for Testing and Materials, International (ASTM) Standard Practice for Environmental Site Assessments: Phase I Site Assessment

---

[7] Hari Hara did not purchase the property directly from Weinstein. Weinstein sold the property in 2001, and it was sold again in 2004. A company called Durga Sai, Inc. (Durga Sai), purchased the property on an "as-is" basis in 2013 and Durga Sai subsequently assigned its interest in the property to Hari Hara.

Process.  Krasnoff opined that a Phase I investigation, costing about $5,000 and including interviews with past and present owners and operators, would have revealed the federal matter and the Settlement Agreement.  (Jang, a party to the Settlement Agreement who was still operating a dry cleaning business at the property when Hari Hara purchased it in 2013, stated in a declaration that if he had been asked about environmental issues at the property, he would have disclosed "that [he] was a party to the Weinstein Litigation and was fully and forever discharged under the [Settlement] Agreement.")  Krasnoff suggested Hari Hara's reliance in 2013 on a Phase I assessment completed in 2004 without a concurrent investigation of conditions on the property was deficient.

### 2.     *Statute of limitations*

In addition to contending the Settlement Agreement's release warranted summary judgment, Team also argued summary judgment was warranted because each of Hari Hara's causes of action is subject to a limitations period of three years or less, the causes of action accrued either in 1995 (when Team ceased operations at the property) or 1998 (when Weinstein discovered PCE contamination at the property), and the persistence of the contamination did not toll the statute of limitations.  Team's statute of limitations defense relied on its amended answer asserting Hari Hara's causes of action were barred by the statutes of limitations codified at Code of Civil Procedure sections "337, 337(a), 337(1) [sic], 337.1, 337.15, 338, 338(a), 338(b), 338(i), 338(l), 340 and 343."

*F.     Hari Hara's Opposition*

Hari Hara objected to much of Team's new evidence and argued, in any case, that the evidence did not demonstrate the Settlement Agreement was intended to effect a release of Weinstein's claims in the absence of Exhibit 1.[8]  Hari Hara further argued that even if the release bound Weinstein, it did not bind Hari Hara.  With respect to the latter point, Hari Hara contended it is not a "successor" or "assign" of Weinstein as provided in the Settlement Agreement, it did not consent to be bound by the Settlement Agreement, and, to the extent the purported release runs with the land, Hari Hara is not a bona fide purchaser for value and lacked notice.  As to notice, Hari Hara argued it was reasonable to forgo a Phase I assessment based on its review of other materials.

Hari Hara submitted a declaration by Paul Wisniewski (Wisniewski), an environmental consultant, geologist, and real estate broker.  Among other things, Wisniewski opined that Krasnoff (Team's expert) was mistaken about the reliability of a 2004 Phase I report under the controlling ASTM standards and,

---

[8]     Among the evidence we have described, Hari Hara objected to a letter documenting Team's settlement payment to Weinstein and enclosing the draft Exhibit 1 because it violated the parol evidence rule and because Team did not produce it in discovery. Hari Hara objected to Kassel, Jones, and Jang's declarations concerning their understanding of the Settlement Agreement as impermissible legal opinions and inadmissible parol evidence. Hari Hara raised the same objections to Hughes's declaration and added hearsay and foundational objections (contending that, as counsel to only one of the parties, he lacked personal knowledge to opine on all parties' understanding of the Settlement Agreement).

11

even if Hari Hara had undertaken a new Phase I assessment in 2013, it was unlikely to uncover the Settlement Agreement.

As to the statute of limitations defense, Hari Hara maintained Team waived it by failing to properly plead the defense in its original answer.  Further, assuming the defense was not waived, Hari Hara argued none of its causes of action accrued before it discovered in 2017 that PCE contamination persisted at excessive levels.  The company additionally argued its HSAA cause of action did not accrue until it incurred remediation costs, and a statute of limitations defense "does not apply to the continuing nuisance and trespass claims at issue here."

### G.  Team's Reply

In addition to reiterating its arguments on the merits, Team submitted a supplemental declaration by Krasnoff elaborating on why Hari Hara could not rely on a 2004 Phase I report in 2013 and, among other things, emphasizing that a Phase I assessment in 2013 would have included an interview with Jang, who would have disclosed the federal matter and Settlement Agreement.  Team also objected to portions of Wisniewski's declaration.  The challenged statements included Wisniewski's interpretation of the Settlement Agreement and discussion of whether Hari Hara would have discovered the Settlement Agreement in the course of a Phase I assessment conducted in 2013.

### H. The Trial Court's Order Granting Summary Judgment

The trial court overruled all of Hari Hara's evidentiary objections. It sustained Team's objections to Wisniewski's declaration and certain other evidence submitted by Hari Hara.

The trial court determined the Settlement Agreement effected a release of Weinstein's claims against Team even though Exhibit 1 was never executed or filed in the federal matter. The trial court reasoned the settling parties did not file Exhibit 1 because the Settlement Agreement "was fully executed and the action was already dismissed by the federal court." Additionally, the evidence showed the settling parties "understood that, and acted as if, the Agreement was in full force and effect."

The trial court found Hari Hara was a successor and assign of Weinstein under the terms of the Settlement Agreement because Hari Hara "came after Weinstein in the chain of title" and because "it assumed the lease agreements for the property." The Settlement Agreement was binding on Hari Hara despite a lack of notice because it "voluntarily accepted the benefits of the transaction by succeeding to the interest of the ownership and control of the subject property, including the leases." The trial court further found that Hari Hara did "not comply with its due diligence obligations" and "cannot now speculate that additional due diligence measures would not have revealed the [federal] [l]itigation and the [Settlement] Agreement."

Alternatively, the trial court determined Hari Hara's causes of action are barred by the relevant statutes of limitations. These, in the court's view, began to run when Weinstein discovered the contamination in 1998 and did not re-start each

13

time the property changed hands.  The contamination constituted a permanent nuisance (as opposed to a continuing nuisance) and its persistence did not toll the relevant statutes.

## II.  DISCUSSION

The trial court's ruling is partially, but not entirely, correct, and we will accordingly reverse the grant of summary judgment and remand solely for further proceedings on the HSAA cause of action.

The trial court did not exceed the scope of this court's remittitur or abuse its discretion when permitting Team to file its amended answer.  The trial court also correctly determined that most of Hari Hara's causes of action are time-barred: except for the cause of action for contribution under the HSAA, Hari Hara's causes of action accrued more than 20 years ago.  Hari Hara's argument characterizing the contamination as a continuing as opposed to a permanent nuisance—such that each repetition re-starts the clock on its nuisance and trespass causes of action—lacks merit in light of uncontroverted evidence that the contamination is not abatable.  Nonetheless, because the HSAA cause of action did not accrue until Hari Hara incurred costs relating to the contamination, that cause of action was timely brought.

Team, however, is not entitled to summary adjudication of the HSAA claim on the theory that it is barred by the Settlement Agreement.  Assuming the Settlement Agreement was effective to release Weinstein's claims against Team and assuming the parties to the Settlement Agreement intended it would bind Weinstein's successors in interest, Team nonetheless has not demonstrated—as a matter of law—that the release is binding on

Hari Hara. Because Team expressly disavows any argument that the release runs with the land, it is left only to argue that Hari Hara is bound by the release because the company's voluntary acceptance of the benefits of the Settlement Agreement implies consent to obligations arising under it. Summary judgment is not warranted on this theory because it is not clear the Settlement Agreement benefited Hari Hara.[9]

> ### A. Almost All of Hari Hara's Causes of Action Are Time-barred
> #### 1. The trial court did not err in allowing Team to amend its answer on remand

Hari Hara contends the trial court improperly permitted Team to amend its answer because this was beyond the scope of the remand in the first appeal and because the amendment was not in the interest of justice. Neither argument has merit.

"The order of the reviewing court is contained in its remittitur, which defines the scope of the jurisdiction of the court to which the matter is returned." (*Griset v. Fair Political Practices Comm.* (2001) 25 Cal.4th 688, 701.) *Hari Hara I* reversed the trial court's grant of summary judgment and remanded for further proceedings consistent with the appellate opinion. "The phrase 'reversed and remanded for proceedings consistent with this opinion' is not a phrase of art with only a single meaning. It must be read with the appellate opinion as a

---

[9]    Because our analysis does not rely on challenged evidence concerning the parties' intent in executing the Settlement Agreement, we do not address Hari Hara's arguments concerning the trial court's evidentiary rulings.

whole.  In context, the phrase may be no more than a statement that . . . the trial court is to apply the law of the case, and in that situation the phrase is surplusage.  [Citations.]  In context, the phrase may be a 'summary method of incorporating by reference directions . . . specifically indicated in the body of the opinion.' [Citation.]" (*Puritan Leasing Co. v. Superior Court* (1977) 76 Cal.App.3d 140, 147-148.)

Hari Hara contends the prior opinion "instructed the trial court to consider the statute of limitations issues based on the pleadings as they were" and the trial court therefore lacked jurisdiction to grant Team's motion for leave to amend.  That misunderstands *Hari Hara I*.  The prior opinion left Team's statute of limitations defense to the trial court to decide "in the first instance," but it did not suggest the trial court must decide the issue as presented only in Team's first motion for summary judgment or foreclose an amended answer.  Rather, the opinion emphasized "the parties may choose *if and when* to raise in the trial court the statute of limitations and related pleading defects . . . ."  (Italics added.)

The trial court's decision to allow Team to file an amended answer was also a permissible exercise of its discretion under Code of Civil Procedure section 473.  That statute provides a trial court "may . . . , in its discretion, after notice to the adverse party, allow, upon any terms as may be just, an amendment to any pleading . . . ."  (Code Civ. Proc., § 473, subd. (a)(1).)  "Ordinarily, courts should 'exercise liberality' in permitting amendments at any stage of the proceeding.  [Citations.]  In particular, liberality should be displayed in allowing amendments to answers, for a defendant denied leave to amend is permanently deprived of a defense.  [Citations.]" (*Hulsey v. Koehler* (1990) 218 Cal.App.3d

16

1150, 1159.) Factors weighing against granting a defendant leave to amend an answer include unexplained delay, lack of diligence, and prejudice to the opposing party. (*Ibid.*)

Here, the trial court granted Team's motion for leave to amend because the proposed amendments "merely cure[d] a technical defect as the original [a]nswer put [Hari Hara] on notice that Team was asserting an affirmative defense based on [the] statute of limitations and Team's prior discovery responses provided the factual bases for the defense." In other words, the trial court determined Team had acted diligently, Team adequately explained the delay in seeking leave to amend, and Hari Hara would not be prejudiced by granting leave to amend.[10] These factual findings are supported by substantial evidence, and it was within the trial court's discretion to conclude they supported granting Team's motion for leave to amend.

Hari Hara's principal counterargument is that Team did not establish the absence of prejudice to Hari Hara if the motion were granted (or prejudice to Team if the motion were denied). Hari Hara's argument that it was prejudiced "by permitting Team to assert [a defense that] Hari Hara long ago understood Team to have waived through insufficient pleading" boils down to a complaint that it was denied a windfall. That is insufficient. (*Landis v. Superior Court* (1965) 232 Cal.App.2d 548, 557 ["it seems unreasonable to deny a party the right to amend where the only apparent hardship to the defendants is that they will have to defend"]; see also *Miles v. City of Los Angeles* (2020) 56

---

[10] Hari Hara's assertion that the trial court improperly considered Team's "good faith" in ruling on its motion for leave to amend its answer has no basis in the record.

17

Cal.App.5th 728, 739 ["Prejudice exists where the proposed amendment would require delaying the trial, resulting in added costs of preparation and increased discovery burdens"].) Additionally, Team was not required to show that it would be prejudiced by denial of its motion. (*Hulsey, supra*, 218 Cal.App.3d at 1159 [identifying "prejudice to the other party"— but not prejudice to the moving party—among the factors weighing against leave to amend].)

### 2. *Hari Hara's first cause of action for contribution under the HSAA is not time-barred*

The parties agree that Hari Hara's first cause of action for contribution under the HSAA is subject to the three-year statute of limitations set forth in Code of Civil Procedure section 338, subdivision (b) for "[a]n action for trespass upon or injury to real property." They dispute, however, the date on which this cause of action accrued.

In *Otay Land Company, LLC v. U.E. Limited, L.P.* (2017) 15 Cal.App.5th 806, the Court of Appeal considered whether the plaintiffs' claim for contribution under the HSAA accrued (1) when they knew or should have known about environmental issues at their property or (2) when "they paid remedial action costs." (*Id.* at 851.) Focusing on the text of former Health and Safety Code section 25363, subdivision (e), which entitled "[a]ny person who *has incurred removal or remedial action costs* in accordance with this chapter . . . [to] seek contribution or indemnity from any person who is liable pursuant to this chapter" (emphasis added), the Court of Appeal held the claim did not accrue until the plaintiffs incurred removal or remedial action costs. (*Ibid.*)

18

Team suggests we should not follow the Court of Appeal's reasoning in *Otay* because that case "did not involve a successor landowner, like Hari Hara, seeking to recoup costs after a predecessor landowner, like Weinstein, already sued for the same remediation costs and settled." That Weinstein's remediation efforts addressed the same type of contamination at the same property does not establish Hari Hara is seeking "the same remediation costs." As Hari Hara's complaint and interrogatory responses make clear, it is seeking to recover, among other things, costs related to monitoring and investigating the current scope of the contamination.

Team's further contention that this case is unlike *Otay* because Hari Hara "incurred *investigation* costs rather than *remediation* costs" is also unpersuasive. At the time *Otay* was decided, former Health and Safety Code section 25322, subdivision (b) defined "remedy" or "remedial action" to include "[t]hose actions that are necessary to *monitor, assess, and evaluate* a release or a threatened release of a hazardous substance." (Italics added.) Although the relevant phrasing had changed by the time Hari Hara filed the operative complaint in 2018 (former Health and Safety Code section 25363, subdivision (d) provided for recovery of "response or corrective action costs" as opposed to "removal or remedial action costs") the statute still applied to costs associated with monitoring hazardous substances.[11] (Fmr. Health & Saf. Code, § 25323.3.)

---

[11] Further amendments effective in 2024 do not change this, as the parties concede. (Health & Saf. Code, §§ 79670, subd. (a) ["A person who has incurred response or corrective action costs in accordance with [the HSAA] may seek contribution or indemnity

19

Hari Hara did not incur response costs until 2017, and its HSAA cause of action did not accrue until then.  Hari Hara timely asserted this cause of action in 2018.

### 3. *Hari Hara's remaining causes of action are time-barred*

Hari Hara's second cause of action for equitable contribution is subject to a two-year limitations period under Code of Civil Procedure section 339, subdivision (1).[12]  (*American*

---

from any person who is liable pursuant to this part"]; 78140 [defining "response"].)

[12]    Hari Hara contends Team waived its defense under this statute because its amended answer does not cite Code of Civil Procedure section 339 or any of its subdivisions.  Hari Hara raised the issue for the first time in its reply brief on appeal. "According to long-standing case law, the failure to allege the appropriate subdivision of the statute of limitations waives the defense. [Citation.]" (*Richard B. LeVine, Inc. v. Higashi* (2005) 131 Cal.App.4th 566, 573, fn. 4; Code Civ. Proc., § 458.) "'Enforcement of that rule, however, depends upon the diligence with which the opposing party objects to the pleading defect by way of demurrer or otherwise.' [Citations.]" (*Southern California Edison Co. v. Severns* (2019) 39 Cal.App.5th 815, 827; accord *Coy v. County of Los Angeles* (1991) 235 Cal.App.3d 1077, 1086, fn. 5.) Hari Hara did not object to Team's pleading of the defense in the trial court, either through a demurrer or in opposition to the second motion for summary judgment, and its presentation of the issue on appeal is also too late.  Under these circumstances, Hari Hara forfeited any argument challenging Team's failure to cite Code of Civil Procedure section 339, subdivision (1) in its amended answer.  Team's motion to strike portions of Hari Hara's reply brief is denied.

*States Ins. Co. v. Nat. Fire Ins. Co. of Hartford* (2011) 202 Cal.App.4th 692, 699.)  Its third cause of action for abatement of a public nuisance, fourth cause of action for abatement of a private nuisance, fifth cause of action for negligence, and sixth cause of action for trespass are all subject to the three-year statute of limitations for "[a]n action for trespass upon or injury to real property."  (Code Civ. Proc., § 338, subd. (b).)  Its eighth cause of action for declaratory relief is subject to the same three-year statute of limitations.  (*Bank of New York Mellon v. Citibank, N.A.* (2017) 8 Cal.App.5th 935, 943 ["A claim for declaratory relief is subject to the same statute of limitations as the legal or equitable claim on which it is based"].)

"In an action involving tortious injury to property, the injury is considered to be to the property itself rather than to the property owner, and thus the running of the statute of limitations against a claim bars the owner and all subsequent owners of the property.  [Citations.]  In other words, the statute of limitations does not commence to run anew every time the ownership of the property changes hands."  (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1216.)  Here, Hari Hara's causes of action (except that under the HSAA) accrued no later than 1998, when Weinstein discovered the property was contaminated.

Hari Hara nevertheless contends its causes of action for nuisance and trespass are not time-barred because the contamination is a continuing (as opposed to a permanent) nuisance.  "In general, a permanent nuisance is considered to be a permanent injury to property for which damages are assessed once and for all, while a continuing nuisance is considered to be a series of successive injuries for which the plaintiff must bring

21

successive actions. . . . With respect to a permanent nuisance, the statute of limitations begins to run on the creation of the nuisance and bars all claims after its passage, while each repetition of a continuing nuisance is considered a separate wrong which commences a new period in which to bring an action for recovery based upon the new injury." (*Beck Development*, *supra*, 44 Cal.App.4th at 1216-1217, citations omitted.)

A plaintiff may not "simply allege that a nuisance is continuing in order to avoid the bar of the statute of limitations," and "[t]here is no short and all-inclusive rule for distinguishing between permanent and continuing nuisances." (*Beck Development*, *supra*, 44 Cal.App.4th at 1217.) "Pollution cases may present peculiar problems" because they are often not amenable to a "continuing-use" test that asks whether a nuisance may be abated by the defendant discontinuing an ongoing use of the land. (*Id.* at 1218.) The test "most often" applied in contamination cases is "whether the nuisance can be abated at any time." (*Id.* at 1219.)

Abatability is not a question of whether decontamination is physically possible. (*Beck Development*, *supra*, 44 Cal.App.4th at 1220 ["Since a defendant could literally be ordered to move mountains to abate a nuisance, virtually everything can be said to be abatable if all other considerations are disregarded"]; *Mangini v. Aerojet-General Corp.* (1996) 12 Cal.4th 1087, 1099 ["we do not agree that mere technological feasibility proves abatability"].) Rather, abatability is "'a convenient shorthand'" for considerations including "the feasible means of, and alternatives to, abatement, the time and expense involved, legitimate competing interests, and the benefits and detriments to be gained by abatement or suffered if abatement is denied."

22

(*Beck Development*, *supra*, at 1220; *Mangini*, *supra*, at 1103 ["'abatable' means that the nuisance can be remedied at a reasonable cost by reasonable means"].)

Here, the Control Board's No Further Action letter indicated the contamination was stable in 2000, with high concentrations of PCE confined to "very hard, low permeability bedrock" that would be "very difficult to remove with conventional excavation equipment." A Phase I assessment performed for an entity affiliated with Weinstein in 2004 "recommend[ed] no further investigations at this time." In deposition testimony discussing the clean-up efforts leading to the No Further Action letter, Weinstein explained the work "was extensive, and whatever the consultants told us to do, it was aggravating, it was drawn out, and I remember doing whatever they told us to do." He elaborated that the work was "aggravating" in the sense that "there seemed to be a lot of requirements that the [Control Board] and others had, and we wanted to make sure that we did everything that we were asked to do." This evidence indicates the PCE contamination could not be removed at a reasonable cost and by reasonable means. (See, e.g., *Beck Development*, *supra*, 44 Cal.App.4th at 1221-1222 [emphasizing a regional water quality control board's "position that nothing further need be done and it is satisfied with leaving the contaminated soil in place" to support the conclusion that contemplated remediation "would be significantly burdensome"].)

Against this evidence that the remaining contamination was not abatable, Hari Hara points to a letter from the Los Angeles County Fire Department approving Hari Hara's "soil vapor extraction expansion, interior excavation, and soft

23

demolition workplan."[13]  The letter does not address the extent of the contamination, the associated risks, or the costs involved. Indeed, with no information regarding the criteria considered in the workplan approval process, the letter is not even probative of technological feasibility.

Hari Hara identifies no evidence to support its repeated assertion that "the contamination . . . spread and required further response."  The only remotely pertinent items it cites are its own interrogatory responses that explain how it learned of the environmental contamination (through an environmental assessment conducted as part of an application to refinance a loan), that state the assessment "revealed the presence of [PCE] and other hazardous substances in the soil and soil vapor," and that list investigative efforts not otherwise reflected in the record.  There is no indication that conditions have materially changed since the No Further Action letter was issued.  And again, there is no discussion of the extent of the contamination, the associated risks, or the costs involved.  On this record, there is no triable issue as to abatability.

Because Hari Hara commenced this action long after the two- and three-year statutes of limitations governing its second, third, fourth, fifth, sixth, and eighth causes of action expired, summary adjudication of these causes of action was proper.

---

[13]     We assume for the sake of argument that the trial court abused its discretion in sustaining Team's objections to this letter.

**B.** *Team Did Not Demonstrate, as a Matter of Law, That Hari Hara Consented to be Bound by the Settlement Agreement*

Team contends summary adjudication of Hari Hara's HSAA cause of action was warranted in light of the Settlement Agreement's release even if the claim was brought within the statute of limitations. For purposes of our analysis of this issue, we assume that all parties to the Settlement Agreement intended it to release Weinstein's claims against the defendants in the federal matter notwithstanding the failure to execute and file the contemplated Exhibit 1. We also assume the parties intended the Settlement Agreement's references to Weinstein's "successors" to include his successors in interest. These assumptions combine to establish that a non-party successor in interest *could* be bound by the Settlement Agreement. Whether any particular successor in interest *is* bound is a separate question.

Consent is an essential element of any contract. (Civ. Code, § 1550; *Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 789.) Team suggests Hari Hara gave its implied consent to be bound by the Settlement Agreement through its voluntary acceptance of the benefits of that agreement. Civil Code section 1589 (Section 1589) provides that "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting."

As a general matter, Section 1589 provides a mechanism to bind the original parties to a contract and those to whom they have assigned their rights under that contract. (*Matthau v. Superior Court* (2007) 151 Cal.App.4th 593, 603 [holding that Section 1589's "principal application is to the parties to the

25

original transaction, and to cases of assignment where the assignee's assumption of liability may be implied from his acceptance of rights and privileges under the contract"]; accord *Recorded Picture Co. v. Nelson Entertainment, Inc.* (1997) 53 Cal.App.4th 350, 362.) Team's suggestion that "Hari Hara is . . . Weinstein's assignee under the [S]ettlement [A]greement" because it is "the assignee of the property" conflates multiple transactions. But even if we assume Section 1589 may apply under the circumstances of this case, Team has not shown there is no triable issue as to whether Hari Hara received any benefit under the Settlement Agreement.

Team contends the Settlement Agreement necessarily benefited Hari Hara because "the settlement monies included (at least partially) monies to reimburse Weinstein for the remediation efforts that led to the 'No Further Action' letter and thus benefitted Hari Hara as the successor property owner." Assuming Hari Hara benefited from Weinstein's remediation efforts, however, it does not follow that Hari Hara benefited from Team and others' payments reimbursing Weinstein for those efforts. So far as the appellate record reveals, Weinstein's remediation activities were completed before the parties reached a settlement in the federal matter.[14] From the perspective of any subsequent owner of the property, it makes no difference whether

---

[14] The No Further Action letter is dated November 29, 2000. A minute order indicates the parties reached a settlement in the federal matter at a settlement conference held on August 16, 2001.

Weinstein was reimbursed for this work—it matters only that it was done.[15]

To the extent that Team suggests Hari Hara is bound by the Settlement Agreement because it voluntarily accepted the benefits of a *different* transaction—i.e., its purchase of the property—this argument is foreclosed by Team's concession that the release does not run with the land.[16] The release is only an "obligation[ ] arising from" Hari Hara's land purchase if it runs with the land. If merely enjoying the benefits of land ownership were sufficient to bind a landowner to its predecessors' promises, the requirements for a covenant to run with the land would serve no purpose. (See generally Civ. Code, § 1468 [listing requirements].)

Team's further argument that Weinstein could not transfer more than he owned also relies on the disavowed assumption that the release burdens the land. Weinstein's rights vis-à-vis Team have no bearing on what he transferred to the next owner and what Hari Hara ultimately acquired unless the restrictions to which Weinstein agreed run with the land or Hari Hara consented to those same restrictions. Team's discussion of cases involving the assignment of contractual rights and duties has no

---

[15] The same analysis applies to Team's invocation of Civil Code section 3521, which codifies the maxim that "[h]e who takes the benefit must bear the burden."

[16] The trial court appears to have identified Hari Hara's land purchase, rather than the Settlement Agreement, as the relevant transaction in its reasoning that "[Hari Hara] . . . voluntarily accepted the benefits of the transaction by succeeding to the interest of the ownership and control of the subject property . . . ."

application to the series of real property transactions by which Hari Hara came to acquire title to the property. (*Drake v. Martin* (1994) 30 Cal.App.4th 984, 994-995 [contrasting "assignment of a contractual right" with "the conveyance of title to real property by grant deed" and emphasizing the lack of authority "holding the transfer of title to real property also transfers [contract] rights the seller may have had"].) Team cites *Veterans of Foreign Wars v. City of El Paso de Robles* (1998) 62 Cal.App.4th 1077 for the proposition that "[a]s a general rule, the grantee of a quitclaim deed takes subject to all equities that could have been asserted against the grantor," but that reliance is unpersuasive given the Court of Appeal's emphasis that "the property [at issue in that case] had a burden." (*Id.* at 1080-1081.)

Regardless of whether the Settlement Agreement released Weinstein's claims against Team and regardless of whether the parties to the Settlement Agreement intended for it to be binding on Weinstein's successors in interest, Team has not shown, for purposes of summary judgment, that Hari Hara consented to be bound.[17]

---

[17] Naturally, we do not hold that Team's theory of consent advanced in this appeal (voluntary acceptance of benefits) is the only theoretical means by which a settlement of environmental claims may be binding on a successive landowner. (See, e.g., Civ. Code, § 854, subds. (c), (d)(3) [subdivisions of the Environmental Responsibility Acceptance Act authorizing a party to commit to remediating contamination in exchange for a release of certain claims that runs with the land and bind "the owner of the site [and] the owner's successors, heirs, and assigns"].)

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to enter a new and different summary adjudication order consistent with the views expressed in this opinion.  The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

KIM, J.

LEE, J.[*]

---

[*] Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.